Therese Marie COLLINS, now known as Therese Marie Gastrow, Plaintiff-Appellant,

v.

ELI LILLY COMPANY; Rexall Drug Company; E.R. Squibb & Sons, Inc.; Abbott Laboratories; Boyle & Company; Cooper Laboratories, Inc. (formerly Brewer & Company, Inc., and Sherman Laboratories) ; Vale Chemical Company, Inc.; Upjohn Company; Cole Pharmacal Company; McNeil Laboratories, Inc.; Carnrick Laboratories, a division of G.W. Carnrick Company; Emons Industries, Inc. (formerly Amfre-Grant and Grant Chemical Company) ; E.S. Miller Laboratories, a division of Smith, Miller & Patch Products; Premo Pharmaceutical Laboratories, Inc.; Kremers-Urban Company; Merck, Sharp & Dohme; William A. Webster Company; and others, Defendants-Respondents.†

Supreme Court

*No. 82–1844. Argued October 3, 1983.—Decided January 4, 1984.*

(Also reported in 342 N.W.2d 37.)

† Motion for reconsideration denied February 27, 1984.

For the plaintiff-appellant there were joint briefs by *Thomas H. Bleakley, Richard J. Dimanin* and *Thomas H. Bleakley, P.C.,* Detroit, Michigan, and *Gerald J. Bloch* and *Phillips, Bloch and Donohue, S.C.,* Milwaukee, and oral argument by *Thomas H. Bleakley.*

For the defendants-respondents there was a joint brief by *Richard C. Ninneman* and *Whyte & Hirschboeck, S.C.,* Milwaukee, and *Hugh L. Moore* and *Lord, Bissell and Brook,* Chicago, Illinois, attorneys for Abbott Laboratories, and on behalf of: *Harold A. Dall, Joseph J. Ferris* and *Kasdorf, Dall, Lewis & Swietlik, S.C.,* Milwaukee, and *Lane D. Bauer, Leo P. Dreyer, Laura D. Stith* and *Shook, Hardy & Bacon,* Kansas City, Missouri, attorneys for Eli Lilly and Company; *Hanlin Hayes,* Milwaukee, attorney for E.R. Squibb and Sons, Inc., and Boyle and Company; *Irving W. Zirbel,* Milwaukee, attorney for Upjohn Company; *Robert W. Connell,* Milwaukee, attorney for Cooper Laboratories and E.S. Miller Laboratories; *William F. Reilly,* Waukesha, attorney for Vale Chemical

Company, Cole Pharmacal Company and Carnrick Laboratories, Inc.; *Carl N. Otjen,* Milwaukee, attorney for Rexall Drug Company; *Edmund W. Powell,* Milwaukee, attorney for Kremers-Urban Company and McNeil Laboratories, Inc.; *Donald H. Carlson,* Milwaukee, attorney for Premo Pharmaceutical Laboratories, Inc.; *John A. Kluwin,* Milwaukee, attorney for Merck, Sharp & Dohme; and *Robert A. DuPuy,* Milwaukee, attorney for Emons Industries, Inc., and oral argument by *Hugh L. Moore* and *Lane D. Bauer.*

WILLIAM G. CALLOW, J. This is an appeal from a judgment and an order of the circuit court for Milwaukee county, Judge Marvin C. Holz, granting summary judgment for the defendant drug companies and denying the plaintiff's motion to amend her second amended complaint to identify as a sole defendant Eli Lilly and Company. The plaintiff appealed and petitioned to bypass the court of appeals pursuant to sec. 808.05 and sec. (Rule) 809.60, Stats. We granted the petition to bypass. We reverse in part and affirm in part the judgment of the trial court granting summary judgment for the defendants, and we remand the case for further proceedings. We affirm the order of the trial court denying the plaintiff's motion to amend her second amended complaint.

The issues presented on appeal are whether the trial court erred in granting summary judgment for the defendants based upon its conclusion that no Wisconsin rule of law would permit the plaintiff to recover for her injuries stemming from her mother's ingestion of the drug diethylstilbestrol (DES), and whether the trial court erred in not permitting the plaintiff to amend her second amended complaint to name a single drug company, Eli Lilly and Company, as defendant.[1]

---

[1] The defendants cross-appealed on the issue whether the plaintiff's cause of action was barred by the running of the statute

In 1957 Mrs. Roseann Collins became pregnant with Therese Marie Collins, the plaintiff in this case. Because Mrs. Collins was having problems with spotting in the early stages of her pregnancy, she consulted her physician, Dr. William P. Wendt. Sometime in the course of his treatment of Mrs. Collins, Dr. Wendt prescribed DES, which he told her would prevent a miscarriage. Mrs. Collins took DES throughout her pregnancy. Mrs. Collins could not recall where she purchased the DES but did recall, without being certain, that "it was a little white [uncoated] pill . . . smaller than an aspirin." Information adduced in the course of discovery revealed that the DES Mrs. Collins took was in the form of 25 milligram pills. The plaintiff was born March 11, 1958, in Milwaukee.

In June or July, 1975, the plaintiff began to experience longer than normal menstrual periods accompanied by severe cramping. On July 24, 1975, Mrs. Collins took the plaintiff to consult Dr. Wendt. During the examination Dr. Wendt discovered a visible lesion in the plaintiff's vagina. Dr. Wendt referred the plaintiff to Dr. William Fetherston for further diagnosis. After examining the plaintiff, Dr. Fetherston concluded that she was suffering from a full cell cancer of the vagina. On August 26, 1975, Dr. Fetherston performed surgery on the plaintiff, removing her uterus, part of her vagina, and a number of lymph nodes. Subsequent analysis by Dr. David Carlson, a pathologist at St. Mary's Hospital in Milwaukee, confirmed that the plaintiff had adenocarcinoma of the vagina and benign adenosis of the vagina. Subsequent to the surgery, the plaintiff discovered that her

of limitations, sec. 893.205, Stats., 1975. However, on August 4, 1983, the defendants, pursuant to sec. (Rule) 809.18, Stats., voluntarily dismissed their cross-appeal on the basis of this court's decision in *Hansen v. A.H. Robins Co., Inc.*, 113 Wis. 2d 550, 335 N.W.2d 578 (1983).

bladder had ceased functioning because of the radical cancer surgery.

On January 6, 1977, the plaintiff filed suit against twelve drug companies which allegedly produced or marketed DES. On November 21, 1977, Judge William R. Moser granted defendants Lilly, Rexall, Squibb, and Abbott's motion to dismiss on the grounds of improper service. On February 28, 1978, the plaintiff filed a second amended complaint, naming five additional drug companies as defendants, and this time effectuated proper service on all defendants.

The plaintiff's second amended complaint alleged five causes of action: that the defendants were negligent in producing and marketing DES for use by pregnant women; that the defendants were strictly liable because DES was a defective and unreasonably dangerous product; that the defendants misrepresented that DES was safe and efficacious for use by pregnant women; that the defendants conspired to misrepresent that DES was safe and efficacious for use by pregnant women; that the defendants acted as a class in manufacturing and marketing DES.[2] The plaintiff demanded $3 million in compensatory damages, together with $3 million in punitive damages.

On May 26, 1981, the defendants jointly moved the court, pursuant to sec. 802.08, Stats., for summary judgment in their favor alleging that there was no genuine issue as to any material fact and that Wisconsin law provided no remedy for the plaintiff based upon the

[2] In her fifth cause of action, the plaintiff realleges her other causes of action and then alleges that all DES drug companies, whether joined in this case or not, engaged in similar actionable conduct in producing and marketing DES. We conclude that this cause of action does not state a separate claim upon which relief may be granted, and, therefore, the trial court correctly granted summary judgment as to the plaintiff's fifth cause of action.

factual record. The defendants also individually moved for summary judgment, variously alleging that the statute of limitations barred recovery, that the defendant drug company had not manufactured or marketed DES in the relevant form, time period, or geographical area, or that the plaintiff's theory of recovery was not recognized under current law.

On April 23, 1982, Judge Marvin C. Holz rendered a memorandum decision on the defendants' joint summary judgment motion. The court granted the motion for summary judgment after examining various theories proposed by the plaintiff to avoid the problem of the plaintiff's inability to identify which defendant drug company produced or marketed the DES taken by her mother. The court concluded that all the theories would necessitate a radical departure from current law, and that if such a departure were appropriate, it should be decided by this court. Accordingly, on September 16, 1982, the trial court entered judgment dismissing the plaintiff's second amended complaint.

On May 20, 1982, the plaintiff filed a motion requesting permission to amend her second amended complaint if she did not appeal from the summary judgment decision of April 23, 1982, or if she appealed and the summary judgment was affirmed. The plaintiff wanted to amend her second amended complaint to name Eli Lilly as the sole defendant on the grounds that there was a reasonable probability that it manufactured the DES taken by the plaintiff's mother. In a memorandum decision dated August 9, 1982, the trial court concluded that the requested amendment was not appropriate because the plaintiff was not alleging any new facts which would support her recently asserted allegation that one drug company manufactured DES. The trial court entered an order denying the plaintiff's motion to amend on August 23, 1982. The plaintiff filed an appeal from the

judgment entered September 16, 1982, and the order entered August 23, 1982.

The problem facing Therese Collins, who alleges injury by in utero exposure to DES, is that she is unable to identify the precise producer or marketer of the DES taken by her mother due to the generic status of some DES, the number of producers or marketers, the lack of pertinent records, and the passage of time. Several courts have applied existing theories of law or crafted new theories to permit DES plaintiffs to avoid the almost insurmountable obstacle of proving that a particular drug company produced or marketed the DES which caused them injury.[3] Other courts have simply denied DES plaintiffs recovery because existing tort law requires plaintiffs to prove that a particular defendant caused the plaintiffs' harm.[4] In determining our approach to this problem, it is appropriate to set forth the factual background against which the issues in this case must be analyzed.

DES is a synthetic estrogenic hormone which duplicates the activity of estrogen, a female sex hormone present in all women and, to a lesser extent, also in men. In women, estrogen is one of the hormones crucial to female sexual development and fertility.

In the late 1930's, DES was synthesized by a group of British medical researchers, but the drug formula was

---

[3] See, e.g., Sindell v. Abbott Laboratories, 26 Cal. 3d 588, 163 Cal. Rptr. 132, 607 P.2d 924 (1980); McElhaney v. Eli Lilly & Co., 564 F. Supp. 265 (D. S.D. 1983); Bichler v. Eli Lilly and Co., 55 N.Y.2d 571, 436 N.E.2d 182 (1982); Abel v. Eli Lilly and Co., 94 Mich. App. 59, 289 N.W.2d 20 (1979).

[4] See, e.g., Morton v. Abbott Laboratories, 538 F. Supp. 593 (M.D. Fla. 1982); Payton v. Abbott Labs., 512 F. Supp. 1031 (D. Mass. 1981); Ryan v. Eli Lilly & Co., 514 F. Supp. 1004 (D. S.C. 1981); Lyons v. Premo Pharmaceutical Labs, Inc., 170 N.J. Super. 183, 406 A.2d 185 (1979); Gray v. United States, 445 F. Supp. 337 (S.D. Tex. 1978).

not patented and, therefore, remained in the public domain. In 1939 and 1940, several drug companies became interested in producing and marketing DES. In order for these companies to produce and market DES for medical use in the United States, they had to file a New Drug[5] Application (NDA) with, and obtain approval of, the Federal Food and Drug Administration (FDA). *See* Federal Food, Drug, and Cosmetic Act, Pub. L. No. 717, 52 Stat. 1040, sec. 201(p) (1938).

By the end of 1940, ten drug companies had filed NDA's, requesting authorization to produce and market DES for four purposes: treatment of menopausal symptoms, senile vaginitis, gonorrheal vaginitis, and suppression of lactation. None of the purposes related to use in problems of pregnancy.

In late 1940, the FDA determined that it would be appropriate for the drug companies to pool their clinical data into a "master file" which the FDA would use as the data base for their decision on the NDA's for DES. Accordingly, in early 1941 several drug companies formed a "small committee" to collect the data accumulated by each of the drug companies filing an NDA for approval of DES. This joint clinical data was included in each company's resubmission of an NDA to produce and market DES for the above-mentioned purposes. In September 1941, the FDA approved the pending NDA's for the production and marketing of DES.

In the 1930's, independent researchers began conducting studies on the role of hormones in pregnancy. These

---

[5] The term "new drug" is defined as: "Any drug the composition of which is such that such drug is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety of drugs, as safe for use under the conditions prescribed, recommended, or suggested in the labeling thereof." Federal Food, Drug, and Cosmetic Act, Pub. L. No. 717, 52 Stat. 1040, 1041–42, sec. 201(p)(1) (1938) [codified as amended at 21 U.S.C. sec. 321(p)(1) (1976)].

researchers found that the administration of estrogen in certain problem pregnancies appeared to help prevent miscarriages by keeping hormonal levels constant during pregnancy. Thus, when an inexpensive, abundant source of estrogen became available in the form of DES, the researchers switched from using natural estrogen to synthetic DES. Based on articles published in the early and mid-1940's containing these researchers' findings on the possible use of DES in preventing miscarriages in problem pregnancies, several drug companies became interested in producing and marketing DES for this newly discovered purpose.

During 1947 and 1948, several drug companies separately filed supplemental NDA's requesting the FDA's approval to produce and market a 25 milligram size of DES for use in problem pregnancies. Most, if not all, of the supplemental NDA's relied on clinical studies published in medical journals, but there is no indication that the companies had any direct connection with the independent researchers. Also, there is no indication that the drug companies worked closely together when they filed their supplemental NDA's. The first supplemental NDA's were reviewed and approved by the FDA during 1947; thereafter, as supplemental NDA's were filed, they were routinely approved. In 1952 the FDA decided that DES was no longer a "new drug," thereby permitting drug companies to produce and market DES for use in pregnancy without having to file NDA's.

DES was produced and marketed from 1947 to 1971. In 1971 medical researchers established a possible statistical link between fetal exposure to DES during pregnancy and the development many years later of adenocarcinoma of the vagina.[6] *See* Note, *Proof of Causation in*

---

[6] The claims that DES was effective in preventing miscarriages were questioned by later medical studies. *See, e.g.,* Dieckmann, Davis, Rynkiewicz and Pottinger, *Does the Administration of*

*Multiparty Drug Litigation,* 56 Tex. L. Rev. 125, 126 n. 11 (1977) ; Note, *Market Share Liability: An Answer to the DES Causation Problem,* 94 Harv. L. Rev. 668, 669 n. 8 (1981) [hereinafter cited as Note, *Market Share Liability*]. In late 1971, the FDA ordered that drug companies label DES as contraindicated for use in pregnancy. 36 Fed. Reg. 21,537–38 (1971).

As noted earlier, the crux of the problem facing this DES plaintiff, and probably many others, is that she cannot identify the drug company that she alleges caused her injury. Numerous commentators and courts have identified several reasons for this plight. First, DES was, for the most part, produced in a "generic" form which did not contain any clearly identifiable shape, color, or markings. DES was a fungible drug produced with a chemically identical formula, and often pharmacists would fill DES prescriptions from whatever stock they had on hand, whether or not a particular brand was specified in the prescription.

Second, it has been estimated that possibly as many as three hundred drug companies produced or marketed DES during the twenty-four years DES was on the market, with different companies entering and leaving the market throughout this period. In this case, the defendants have produced evidence that during 1957 and 1958, the years DES was prescribed for the plaintiff's mother, at least one hundred twenty companies marketed DES in the 25 milligram size. The plaintiff has countered with assertions that the bulk manufacture of DES was dominated by only a few companies. Nevertheless, there may be many companies, both producers and mar-

---

*Diethylstilbestrol During Pregnancy Have Therapeutic Value?,* 66 Am. J. Obstet. & Gynec. 1062 (1953). Obviously, this information was available to the drug companies, but they nonetheless continued producing and marketing DES for use in pregnancy until it was banned in 1971.

keters, that share potential liability for the plaintiff's injuries.

Third, it appears that many drug companies may not have kept or may not be able to locate pertinent records as to when, where, and what type of DES they produced or marketed. Similarly, this plaintiff, and probably others, does not have records identifying the type of DES prescribed for and taken by her mother. These problems result from the passage of many years between the plaintiff's in utero exposure and the manifestation of cancer. During the intervening years, memories may have faded, medical and pharmaceutical records may have been lost or destroyed, and witnesses may have died.

By the time that DES was banned for use in pregnancy in 1971, many women already had been exposed to DES during their mothers' pregnancies.[7] Reliable estimates placed the number of individual or class action DES suits then pending at approximtaely 1,000. *See* Note, *Market Share Liability,* at 669. It is probable, given the sheer number of potential victims, that many more suits will arise. Thus, it is quite clear that in this case we are not dealing with an isolated, unique set of circumstances which will never occur again. We are faced with a choice of either fashioning a method of recovery for the DES case which will deviate from traditional notions of tort law, or permitting possibly negligent defendants to escape liability to an innocent, injured plaintiff. In the interests of justice and fundamental fairness, we choose to follow the former alternative.

We note at the outset that the common law tort rule requires that a plaintiff prove not only duty, breach of

---

[7] In this case alone, Dr. Wendt, the physician treating the plaintiff's mother, estimated that he had over the course of his career prescribed DES in five hundred pregnancies.

duty, and injury, but also legal causation between a defendant's conduct and a plaintiff's injury. *See Fondell v. Lucky Stores, Inc.,* 85 Wis. 2d 220, 226–28, 270 N.W.2d 205 (1978). To recover, Therese Collins would have to prove that a particular drug company produced or marketed the DES taken by her mother. As we noted earlier, this proof is an insurmountable obstacle for Therese Collins even if she can establish all the remaining elements of her cause of action.

Article I, sec. 9 of the Wisconsin Constitution provides, in part, that "[e]very person is entitled to a certain remedy in the laws for all injuries, or wrongs which he may receive in his person, property, or character." We have interpreted this provision of the constitution in the following manner: " 'When an adequate remedy or forum does not exist to resolve disputes or provide due process, the courts, under the Wisconsin Constitution, can fashion an adequate remedy.' " *In Interest of D.H.,* 76 Wis. 2d 286, 294, 251 N.W.2d 196 (1977) (citation omitted). We have recognized that:

"[i]nherent in the common law is a dynamic principle which allows it to grow and to tailor itself to meet changing needs within the doctrine of *stare decisis,* which, if correctly understood, was not static and did not forever prevent the courts from reversing themselves or from applying principles of common law to new situations as the need arose."

*Bielski v. Schulze,* 16 Wis. 2d 1, 11, 114 N.W.2d 105 (1962). Because we conclude Therese Collins is entitled to a remedy at law for her injuries, we now consider each of the theories proposed in this appeal to support her right to recovery.

Therese Collins first proposes that we adopt the "alternative liability" theory enunciated in *Summers v. Tice,*

33 Cal. 2d 80, 199 P.2d 1 (1948), holding the defendants liable without requiring the plaintiff to prove the identity of a specific tortfeasor. In *Summers* two hunters negligently shot in the direction of the plaintiff, but it could not be ascertained which hunter's bullet injured the plaintiff. In response to the plaintiff's inability to identify the actual tortfeasor, the court developed a theory, which is summarized as follows:

"Where the conduct of two or more actors is tortious, and it is proved that harm has been caused to the plaintiff by only one of them, but there is uncertainty as to which one of them has caused it, the burden is upon each such actor to prove that he has not caused the harm."

Restatement (Second) of Torts sec. 433B(3) (1965). Thus, under this theory when all defendants, although acting independently, have breached a duty of care toward the plaintiff but only one of them caused the injury, each defendant must prove that he or she did not cause the plaintiff's injury or be jointly and severally liable with all other defendants. In effect, the burden of proof as to causation shifts to each defendant who must prove that he or she did *not* cause the plaintiff's injuries. This rule represents a policy determination that an innocent plaintiff should not be without remedy because he or she is unable to prove which of the negligent defendants caused the harm. *See Summers,* 33 Cal. 2d at 86–88, 199 P.2d at 4–5.

We agree with the commentators and courts that have concluded the alternative liability theory does not present a viable theory for DES cases. First, the alternative liability theory is, in part, premised on the assumption the defendants will be "in a far better position [than the plaintiff] to offer evidence to determine which one caused the injury." *Summers,* 33 Cal. 2d at 86, 199 P.2d at 4. In this case, both the plaintiff and the defendants

have problems with access to information about DES production and marketing. Second, the alternative liability theory formulation contemplates that all negligent defendants will be joined in the suit. Thus, the court can be sure that at least one of the defendants was directly responsible for the plaintiff's harm. In a DES case, however, there may be hundreds of defendants that may be liable, and, therefore, the probability that any one defendant caused the plaintiff's harm may be correspondingly small. *See Sindell v. Abbott Laboratories,* 26 Cal. 3d 588, 602–03, 163 Cal. Rptr. 132, 139, 607 P.2d 924, 931 (1980). Moreover, it may be impossible to identify all DES producers or marketers because of the fluid nature of the market over the years DES was produced or marketed for use in pregnancy. Third, the alternative liability formula does not, in its pure form, provide a fair way to apportion damages among the defendants. Under the alternative liability theory, defendants that produced or marketed small amounts of DES and those that produced or marketed large amounts would be equally liable.

The plaintiff next asks this court to adopt the "concerted action" theory of liability. Under this theory there are three variants: pure concerted action, "enterprise liability," and, as the plaintiff has alleged in this case, civil conspiracy.

The concerted action theory of liability rests upon the principle that "those who, in pursuance of a common plan or design to commit a tortious act, actively take part in it, or further it by cooperation or request, or who lend aid or encouragement to the wrongdoer, or ratify and adopt his acts done for their benefit, are equally liable with him. Express agreement is not necessary, and all that is required is that there be a tacit understanding." W. Prosser, *Handbook of The Law of Torts,* sec. 46 at 292

(4th ed. 1971) (footnotes omitted). *See also* Restatement (Second) of Torts sec. 876 (1979). Although this court has not explicitly adopted the Restatement rule, we have applied a variant of the theory in "drag racing" cases which imposed joint and several liability on all defendants participating in a drag race even if only one of the defendants actually caused the plaintiff harm. *See, e.g., Ogle v. Avina,* 33 Wis. 2d 125, 134–35, 146 N.W.2d 422 (1966).

Even assuming that the defendants acted tortiously toward the plaintiff, the plaintiff, under the concerted action theory of liability, must also be able to prove that there was an agreement or, at least, a tacit understanding among the defendants. In this case, the "gravamen of the charge of concert is that defendants failed to adequately test [DES] or to give sufficient warning of its dangers and that they relied upon the tests performed by one another and took advantage of each others' promotional and marketing techniques." *Sindell,* 26 Cal. 3d at 605, 607 P.2d at 932. We agree with the California court's conclusion in *Sindell* that such allegations do not support the theory that the defendants tacitly agreed to produce and market DES without adequately testing the drug or warning of its potential dangers. Although there was a substantial amount of parallel action by the defendants in producing and marketing DES for use in pregnancy, we conclude that this does not rise to the level of "acting in concert."

We also note that the conceptual underpinnings of the concerted action theory make it inapplicable to DES cases. The concerted action theory typically is applied to situations in which, unlike this DES case, a particular defendant is already identified as causing the plaintiff's harm, and the plaintiff desires to extend liability to those acting in league with that defendant. Comment, *Over-*

coming the Identification Burden in DES Litigation: The Market Share Liability Theory, 65 Marq. L. Rev. 609, 618 (1982). The theory rarely has been used to help plaintiffs avoid the identification requirement, Note, DES: Judicial Interest Balancing and Innovation, 22 B.C. L. Rev. 747, 759–60 (1981), and we decline to do so in this case.

Another variant of the concerted action theory of liability is found in the concept of industrywide, or "enterprise liability," which was first suggested in Hall v. E.I. Du Pont De Nemours & Co., Inc., 345 F. Supp. 353 (E.D. N.Y. 1972). Hall involved persons who had been injured by blasting caps manufactured by a limited number of defendants under substantially similar industry-imposed safety standards. The court reasoned that such evidence could support a finding that the defendants jointly controlled the risk of harm, and therefore, the issue of which defendant actually caused the plaintiff's harm became less important than the fact that the industry as a whole engaged in hazardous conduct. Id. at 374, 372. Under enterprise liability theory, it is the industry-wide standard that is the cause of injury, and each defendant that participates in perpetuating and using the inadequate standard has contributed to and is liable for the plaintiff's injury. See Comment, DES and A Proposed Theory of Enterprise Liability, 46 Fordham L. Rev. 963, 997 (1978).

We conclude that the enterprise liability theory should not be applied in this case. First, unlike Hall, this case involves perhaps hundreds of potential defendant drug companies. Thus, the assumption that the defendants jointly controlled the risk of injury is necessarily weak given the fact that so many drug companies entered and

left the DES marketplace from 1947 to 1971.[8] Second, the drug industry operates under the control of the FDA, which sets the standards and conditions the drug industry must meet to produce and market a particular drug. It is less clear in DES cases than in *Hall* that the defendant drug companies were each violating a standard of safety, whether federally imposed or industry imposed, in producing and marketing DES for use in pregnancy. We recognize, however, that adherence to FDA standards does not in itself absolve a drug company of liability. *See Stevens v. Parke, Davis & Co.*, 9 Cal. 3d 51, 65, 107 Cal. Rptr. 45, 53, 507 P.2d 653, 661 (1973).

Finally, the plaintiff in this case relies on the theory of civil conspiracy, alleging that the defendants conspired to misrepresent that DES was safe and efficacious for use in pregnancy. A civil conspiracy is "a combination of two or more persons by some concerted action to accomplish some unlawful purpose or to accomplish by unlawful means some purpose not in itself unlawful." *Radue v. Dill*, 74 Wis. 2d 239, 241, 246 N.W.2d 507 (1976) (citation omitted). The plaintiff asserts that the defendant drug companies formed and operated a conspiracy to gain FDA approval of DES in 1941 and then carried the conspiracy into seeking FDA approval in 1947 and 1948 for use of DES in problem pregnancies. Then, the plaintiff contends, the drug companies used the fruits of their conspiracy, i.e., FDA approval to produce and market DES for pregnancy, to misrepresent to

---

[8] Indeed, the court in *Hall* cautioned against using enterprise liability for large numbers of defendant companies, stating that "[w]hat would be fair and feasible with regard to an industry of five or ten producers might be manifestly unreasonable if applied to a decentralized industry composed of thousands of small producers." *Hall v. E.I. Du Pont De Nemours & Co., Inc.*, 345 F. Supp. 353, 378 (E.D. N.Y. 1972).

the public at large, including the plaintiff's mother, that DES was safe and efficacious.

We conclude that an action for civil conspiracy cannot be pursued on the allegations made in this case. As we noted earlier, the drug companies apparently engaged in parallel behavior in both 1941 and 1947, but parallel behavior alone cannot prove agreement. There is no indication in the record that the defendants either explicitly or tacitly collaborated to gain FDA approval so that they could in turn collaborate to misrepresent the safety and efficacy of DES for use in preventing miscarriages. Even assuming that there was close enough cooperation in 1941 to constitute an agreement, we cannot conclude that the agreement extended to the filing of supplemental NDA's in 1947 and 1948. Further, this theory becomes unworkable when we consider the fact that many drug companies entered the DES market well after FDA approval. These later entrants should not be charged with participation in or knowledge of the alleged 1941 and 1947 conspiracies.

The final theory proposed by the plaintiff is the "market share" theory adopted by the California Supreme Court in *Sindell v. Abbott Laboratories, supra.* *Sindell* applied "a modification of the rule of *Summers*" and fashioned an apportionment of liability based on the relative market share of each of the liable defendants. In *Sindell* the court held that, once the plaintiff joins manufacturers of a "substantial share" of the DES produced and marketed in the relevant area and proves a prima facia case on every element except identification of the direct tortfeasor, the burden of proof shifts to the defendants to prove that they did not cause the plaintiff's injuries. *Sindell,* 26 Cal. 3d at 612, 607 P.2d at 937. This can be done by each defendant demonstrating that

it could not have made the DES which caused the plaintiff's injuries. *Id.* Those defendants failing in this proof are held liable for the percentage of damages approximating their share of the relevant market. *Id.* The *Sindell* court reasoned that it was fair to shift the burden of proof on causation to the defendants in light of the fact that each defendant's market share, and therefore its share of the damages, would approximate the probability that it caused the plaintiff's injuries. *Id.*

Although we do not question the fundamental fairness of *Sindell's* shifting the burden of proof to the defendants, we conclude that the *Sindell* market share theory for apportioning damages should not be adopted in Wisconsin. The court in *Sindell* admitted that it was "not unmindful of the practical problems involved in defining the market and determining market share," but declined to use that as a reason for not adopting the market share theory. *Sindell,* 26 Cal. 3d at 613, 607 P.2d at 937. We conclude, however, that unalloyed market share theory does not constitute the most desirable course to follow in DES cases because the theory, while conceptually attractive, is limited in practical applicability.

The primary factor which prevents us from following *Sindell* is the practical difficulty of defining and proving market share. As noted earlier, it appears many drug companies simply do not have records available from which a fact finder could determine how much DES a given defendant produced or marketed, or when and where the DES was produced and marketed. Even assuming that some drug companies have records, the fact finder still may not be able to compose an accurate assessment of the total market of which those companies were a part. There are several reasons for this: The DES market apparently was quite fluid, with companies entering and leaving the market over the years; some companies no longer exist and some that still exist may

not have relevant records; and apparently there are no accurate nationwide records pertaining to the overall production and marketing of DES. We view defining the market and apportioning market share as a near impossible task if it is to be done fairly and accurately in order to approximate the probability that a defendant caused the plaintiff's injuries.[9] Further, we conclude that the waste of judicial resources which would be inherent in a second "mini-trial" to determine market share militates against its adoption by this court. We emphasize, however, that we do not totally reject the market share theory. Rather, as we explain below, we consider market share, if determinable, to be a relevant factor in apportioning liability among defendants.

We recognize that DES cases pose difficult problems. The entirely innocent plaintiffs may have been severely harmed by a drug they had no control over, and they may never know or be able to prove with certainty which drug company produced or marketed the DES taken by their mothers. The defendants are faced with possible liability for DES which they may not have produced or

---

[9] We find a flaw in *Sindell's* reasoning in that it would appear to permit each defendant's market share to be increased proportionately to ensure that the plaintiff recovers her damages. *See Sindell,* 26 Cal. 3d at 612–13, 607 P.2d at 937; *see also id.* at 617, 607 P.2d at 940 (Richardson, J., dissenting). While we support the plaintiff's recovery of all her damages, requiring a defendant to pay more than its percentage of the market is directly contrary to the court's reasoning that percentage of the market approximates the probability that the defendant produced or marketed the subject DES. Furthermore, the *Sindell* court did not address itself to the problem of what is to be done with those defendants that do not have any records with which to establish their market share. Simply arbitrarily assigning the remaining percentage of the market to these defendants does not comport with probable liability. *See generally id.* and *Trends in Products Liability Litigation,* 16 Trial 82, 84 (Nov. 1980) (interview with Justice Stanley Mosk, author of the *Sindell* opinion).

marketed. We conclude, however, that as between the plaintiff, who probably is not at fault, and the defendants, who may have provided the product which caused the injury, the interests of justice and fundamental fairness demand that the latter should bear the cost of injury. Accordingly, we have formulated a method of recovery for plaintiffs in DES cases in Wisconsin. We note that this method of recovery could apply in situations which are factually similar to the DES cases.

Although the defendants in this case may not have acted in concert under the concert of action theory, all participated in either gaining approval of DES for use in pregnancy or in producing or marketing DES in subsequent years. Each defendant contributed to the *risk* of injury to the public[10] and, consequently, the risk of injury to individual plaintiffs such as Therese Collins. Thus each defendant shares, in some measure, a degree of culpability in producing or marketing what the FDA,

---

[10] A "risk contribution" theory is proposed in Robinson, *Multiple Causation in Tort Law: Reflections on the DES Cases*, 68 Va. L. Rev. 713 (1982). Robinson argues that, from the standpoint of fairness in placing liability on the drug companies, "the critical point is the *creation of a risk* that society deems to be unreasonable, not whether anyone was injured by it." *Id.* at 739 (emphasis in original). Because all DES drug companies produced or marketed a "defective" product, Robinson contends, they all contributed to the risk of injury, even though they may not have contributed to the actual injury of a given plaintiff. *Id.* at 739–40. Using this premise, Robinson argues that the plaintiff's damages should be apportioned "among all defendants that created unreasonable risks according to the magnitude of the risks they created." *Id.* at 755. Although we find Robinson's "risk contribution" theory sound to the extent it recognizes that all DES drug companies contributed in some measure to the risk of injury, we do not agree that this is a sufficient basis in itself for liability. We still require it be shown that the defendant drug company reasonably could have contributed in some way to the actual injury.

many scientists, and medical researchers ultimately concluded was a drug with possibly harmful side effects. Moreover, as between the injured plaintiff and the possibly responsible drug company, the drug company is in a better position to absorb the cost of the injury. The drug company can either insure itself against liability, absorb the damage award, or pass the cost along to the consuming public as a cost of doing business. We conclude that it is better to have drug companies or consumers share the cost of the injury than to place the burden solely on the innocent plaintiff. Finally, the cost of damages awards will act as an incentive for drug companies to test adequately the drugs they place on the market for general medical use.[11] This incentive is especially important in the case of mass-marketed drugs because consumers and their physicians in most instances rely upon advice given by the supplier and the scientific community and, consequently, are virtually helpless to

---

[11] In their briefs and at oral argument, the defendants contended that imposing liability on possibly innocent drug companies will discourage drug companies from producing or marketing generic drugs. It has been argued that society benefits from generic drugs because they are easier to produce and market and are, therefore, cheaper for the consumer. The defendants contend that, if liability were imposed on all defendants because the plaintiff cannot, due to the generic nature of DES, identify the exact producer or marketer, drug companies would seek to avoid future liability by not producing or marketing generic drugs.

While there may be some validity to the defendants' argument, we do not agree that imposing liability in this case will cause drug companies to cease producing or marketing generic drugs. We believe that this sort of liability will encourage drug companies to produce or market *safe* generic drugs. So long as drug companies properly test drugs and thereby produce or market a reasonably safe product, they need not fear liability under the rule of this case. Thus, it is not solely the generic status of the drug but the safety or efficacy of the drug, generic or otherwise, which may give rise to liability.

protect themselves from serious injuries caused by deleterious drugs.

Practical considerations favor permitting the plaintiff to proceed, at least initially, against one defendant. One alternative would be to require the plaintiff, as in *Sindell,* to join as defendants "a substantial share" of the producers and marketers of DES. We conclude that this is unworkable because of the problems we noted earlier inherent in trying to establish the relevant market and each defendant's share of that market. Another alternative would be to require the defendant to join a "reasonable number" of possibly liable defendants. We cannot, however, define what that "reasonable number" would be because there are so many potentially liable drug companies. Moreover, either alternative would waste judicial resources by requiring an initial determination of whether the plaintiff has joined a sufficient number of defendants. We also conclude that the defendant is in a better position than the plaintiff to determine which other drug companies may share liability. We recognize that many drug companies do not have relevant records, but they, as participants in the DES market, presumably have more information or potential access to relevant information than does the plaintiff.

Thus, the plaintiff need commence suit against only one defendant and allege the following elements: that the plaintiff's mother took DES; that DES caused the plaintiff's subsequent injuries; that the defendant produced or marketed the type of DES taken by the plaintiff's mother; and that the defendant's conduct in producing or marketing the DES constituted a breach of a legally recognized duty to the plaintiff. In the situation where the plaintiff cannot allege and prove what type of DES the mother took, as to the third element the plaintiff need only allege and prove that the defendant drug com-

pany produced or marketed the drug DES for use in preventing miscarriages during pregnancy. Applying the rules of liberal construction to complaints, we construe the plaintiff's second amended complaint as satisfying these required allegations.

At the trial of this case the plaintiff will have to prove each of these elements to the satisfaction of the trier of fact. We emphasize, however, that the plaintiff need not prove that a defendant produced or marketed the precise DES taken by the plaintiff's mother. Rather, the plaintiff need only establish by a preponderance of the evidence that a defendant produced or marketed the *type* (e.g., color, shape, markings, size, or other identifiable characteristics) of DES taken by the plaintiff's mother; the plaintiff need not allege or prove any facts related to the time or geographic distribution of the subject DES. If the plaintiff is able to prove these elements, the plaintiff may recover all damages from the one defendant. If, however, more than one defendant is joined, the plaintiff should recover from each defendant damages proportionate to the jury's assignment of liability under the comparative negligence scheme developed below.

Although we hold that it is sufficient for the plaintiff to sue only one defendant, we recognize that the plaintiff may find it preferable to sue as many defendants as can be identified as having possible liability. Simple self-interest should encourage the plaintiff to sue more than one defendant drug company. If the plaintiff cannot prove the case against the single defendant, an action against other potentially liable defendants may be barred by the statute of limitations. A suit against more than one defendant, besides giving the plaintiff more opportunities to establish liability, also ensures that the plaintiff will have a better chance of actually recovering damages because there is always the possibility that the single defendant will be judgment proof.

We assume that the incentives identified above will encourage the plaintiff to sue a number of drug companies. However, in order to assure that liability in multiple defendant DES cases is equitably distributed among as many defendants as possible, any defendant may, pursuant to sec. 803.05, Stats., implead as third-party defendants other drug companies which it can allege produced or marketed the type of DES taken by the plaintiff's mother. This will permit any originally named defendant to share liability with other defendants, and will thereby result in damages being more equitably distributed among all those defendants found liable for the plaintiff's injuries. In this case, we believe it fair to direct the trial court to grant leave to the existing defendants to implead upon proper notice other possibly liable defendants. *See* sec. 803.05, Stats. After the trial court has given the defendants an opportunity to implead other defendants, Therese Collins' case may proceed to trial on two causes of action: negligence and strict products liability.

On a negligence theory, the plaintiff must prove that a defendant drug company had a duty of care and breached that duty of care when it produced or marketed DES. *See Fondell,* 85 Wis. 2d at 226–27. We note, however, that on the issue of identifying the defendant that caused the plaintiff's injury, the plaintiff need only prove by a preponderance of the evidence that an allegedly negligent defendant drug company produced or marketed the type of DES taken by the plaintiff's mother.

The plaintiff in this case may also proceed under a theory of strict products liability. In order to prevail on this theory, the plaintiff must prove (1) that the DES was defective when it left the possession or control of

the drug company; (2) that it was unreasonably danger-
ous to the user or consumer; (3) that the defect was a
cause of the plaintiff's injuries or damages; (4) that
the drug company engaged in the business of producing
or marketing DES or, put negatively, that this is not an
isolated or infrequent transaction not related to the
principal business of the drug company; and (5) that
the product was one which the company expected to
reach the user or consumer without substantial change in
the condition it was when sold. *See Dippel v. Sciano*, 37
Wis. 2d 443, 460, 155 N.W.2d 55 (1967). We reiterate
that on the issue of identifying the defendant that caused
the plaintiff's injury, the plaintiff need only prove by a
preponderance of the evidence that a defendant drug
company produced or marketed the allegedly defective
and unreasonably dangerous type of DES taken by the
plaintiff's mother.

At oral argument, defendants' counsel claimed that
drug companies can be held liable only on a negligence
theory, not on a strict products liability theory. Support
for this proposition is found in comment k to sec. 402A
of the Restatement (Second) of Torts (1965). Comment
k identifies drugs as unavoidably unsafe products be-
cause "in the present state of human knowledge, [they]
are quite incapable of being made safe for their intended
and ordinary use." Under the premise that properly pre-
pared drugs accompanied by proper directions and warn-
ings are, therefore, not *unreasonably* dangerous, the
comment concludes that the sellers of drug products
should not be held strictly liable "for unfortunate con-
sequences attending their use." The comment advances
as a policy justification for this rule the necessity for
some drugs to be put on the market without adequate
testing because of the urgent need for treatment of a
serious health hazard. The comment, however, recognizes

that such preparation and marketing requires that a proper warning be given if the provider is not to be held strictly liable.

Although we adopted sec. 402A in *Dippel v. Sciano, supra,* we specifically declined to accept or reject any of the comments. *Dippel,* 37 Wis. 2d at 459. We have not adopted comment k to sec. 402A, and we decline to do so in this case. We conclude that the rule embodied in comment k is too restrictive and, therefore, not commensurate with strict products liability law in Wisconsin.

Drug companies, like other sellers or manufacturers, have a duty to produce and market reasonably safe products. We recognize that in some exigent circumstances it may be necessary to place a drug on the market before adequate testing can be done. Insofar as these circumstances exist, we agree with the comment that strict liability should not be imposed. However, we find no exigent circumstances which would excuse DES producers or marketers from adequately testing DES before it was placed on the market. Although there was a societal interest in preventing miscarriages in pregnancy, alternative treatment was available, and the problem did not approach epidemic proportions. Even assuming there were exigent circumstances in 1947 necessitating the use of DES in pregnancy without adequate testing, an additional ten years had elapsed by the time the plaintiff's mother took DES. Thus, it would appear the drug companies had sufficient time to test DES thoroughly even if the original need to place it on the market foreclosed adequate testing at that time. Accordingly, we hold that DES producers or marketers may be held strictly liable if the plaintiff establishes the five elements specified earlier.

Once the plaintiff has proven a *prima facie* case under either cause of action, the burden of proof shifts to the

defendant to prove by a preponderance of the evidence that it did not produce or market the subject DES either during the time period the plaintiff was exposed to DES or in the relevant geographical market area in which the plaintiff's mother acquired the DES. In utilizing these defenses, the defendant must establish that the DES it produced or marketed could not have reached the plaintiff's mother. We conclude that it is appropriate to shift the burden of proof on time and geographic distribution to the defendant drug companies because they will have better access to relevant records than the plaintiff. Further, if relevant records do not exist, we believe that the equities of DES cases favor placing the consequences on the defendants.

We believe that this procedure will result in a pool of defendants which it can reasonably be assumed could have caused the plaintiff's injuries. We note in this regard that, in cases where the plaintiff's mother took DES over a period of time and had the prescription refilled, it is possible that DES from several drug companies may have contributed to the plaintiff's injuries. This still could mean that some of the remaining defendants may be innocent, but we accept this as the price the defendants, and perhaps ultimately society, must pay to provide the plaintiff an adequate remedy under the law.[12]

Regardless of which causes of action the plaintiff in this case proceeds upon, the jury will have to apply Wisconsin's comparative negligence statute, sec. 895.045,

---

[12] The defendants argue that the plaintiff's remedy in this type of case should be fashioned by the legislature. The defendants cite as examples black lung legislation and the proposed fund for victims of asbestos-caused diseases. We disagree with this argument. It is the function of this court to modify the existing common law if that becomes necessary to promote justice under the law.

Stats.[13] Under Wisconsin's comparative negligence doctrine, the amount of liability—and hence, the proportion of the total damages—is determined in proportion to the percentage of causal negligence attributable to each defendant. *Bielski,* 16 Wis. 2d at 6. Comparative negligence will be determined by the trier of fact both under a negligence theory, *see generally Bielski v. Schulze, supra,* and under a strict products liability theory because of our "negligence per se" formulation of liability, *see Dippel,* 37 Wis. 2d at 460–62; *Greiten v. La Dow,* 70 Wis. 2d 589, 600, 235 N.W.2d 677 (1975).

After carefully weighing the alternatives, we conclude that the application of comparative negligence in DES cases provides the most equitable means to assign liability and apportion damages among the liable defendants. As this court has stated:

". . . The apportionment of negligence is the peculiar province of the jury. The degree of negligence attributable to a party is not to be measured by the character thereof nor by the number of respects in which he is found to have been at fault. It is the conduct of the parties considered as a whole which should control. In other words, once it has been established that each has been negligent, it is then the jury's function to weigh their respective contributions to the result, which will, regardless of the nature of their acts or omissions, determine which made the larger contribution and to what extent it exceeds or is less than that of the other. "

*Taylor v. Western Casualty & Surety* Co., 270 Wis. 408, 411–12, 71 N.W.2d 363 (1955). In discussing the gen-

---

[13] Section 895.045, Stats., provides:

"**Contributory negligence.** Contributory negligence shall not bar recovery in an action by any person or his legal representative to recover damages for negligence resulting in death or in injury to person or property, if such negligence was not greater than the negligence of the person against whom recovery is sought, but any damages allowed shall be diminished in the proportion to the amount of negligence attributable to the person recovering."

eral theory of comparative negligence, we have recognized that it "is an equitable doctrine based on natural justice." *Bielski,* 16 Wis. 2d at 7.

We believe that comparative negligence is a flexible doctrine which will permit the jury in DES cases equitably to apportion liability among the defendants that have been unable to exculpate themselves. In assigning a percentage of liability to each defendant, the jury may consider factors which include, but are not limited to, the following: whether the drug company conducted tests on DES for safety and efficacy in use for pregnancies; to what degree the company took a role in gaining FDA approval of DES for use in pregnancies; whether the company had a small or large market share in the relevant area; whether the company took the lead or merely followed the lead of others in producing or marketing DES; whether the company issued warnings about the dangers of DES; whether the company produced or marketed DES after it knew or should have known of the possible hazards DES presented to the public; and whether the company took any affirmative steps to reduce the risk of injury to the public. This list of factors is not exclusive, and the trial court may in its discretion permit the jury to consider other factors relevant to apportioning liability. Although the allocation of liability will present a difficult task for juries, we conclude that it is the best method to ensure that liability will be assigned equitably accorded to relative fault.[14]

---

[14] We note that in multiple tortfeasor cases the negligence of the plaintiff is compared to the negligence of each defendant. *Wisconsin Natural Gas v. Ford, Bacon & Davis Construction,* 96 Wis. 2d 314, 327, 291 N.W.2d 825 (1980). We cannot conceive, however, of any situation where the DES plaintiff, who was a fetus at the time the DES was taken, could be attributed with anything but zero percent negligence. Consequently, we presume that in all DES cases 100 percent of the liability will be apportioned only among the defendants.

We recognize that under Wisconsin's strict products liability law the sale of a defective and unreasonably dangerous product constitutes, assuming all other elements are proven, negligence per se. *Greiten,* 70 Wis. 2d at 600. The plaintiff is relieved of proving specific acts of negligence on the part of the defendant, *Dippel,* 37 Wis. 2d at 460, because it is the nature of the product, not the degree of care, which gives rise to liability, *Greiten,* 70 Wis. 2d at 604. Therefore, the preceding factors need not be used to establish negligence because negligence per se can be proven through the five elements specified in our discussion concerning strict products liability in DES cases. However, the factors may properly be used to apportion liability among the defendants the jury determines to be strictly liable for the DES plaintiff's injuries.

A final element of damages merits discussion. The plaintiff in this case has sought punitive damages because the defendants allegedly recklessly disregarded the plaintiff's rights by their conduct associated with the production and marketing of DES. In order to recover punitive damages in Wisconsin, the injured party must show a wanton, willful, or reckless indifference to or disregard for the rights of others on the part of the wrongdoer. *Fahrenberg v. Tengel,* 96 Wis. 2d 211, 221, 291 N.W. 2d 516 (1980). Similarly, punitive damages may be awarded in products liability cases where it is shown that the defendant wantonly, willfully, or recklessly disregards the plaintiff's rights by selling a defective and unreasonably dangerous product. *Wangen v. Ford Motor Co.,* 97 Wis. 2d 260, 308, 294 N.W.2d 437 (1980).

Punitive damages are designed to punish a wrongdoer and to serve as a deterrent. *Mid-Continent Refrigerator*

*Co. v. Straka,* 47 Wis. 2d 739, 746, 178 N.W.2d 28 (1970). The concept of punitive damages embodies a rule for individualized punishment of a wrongdoer whose conduct toward the plaintiff is particularly outrageous. Implicit in this concept is the notion that, where punishment is to be exacted, it must be certain that the wrongdoer being punished because of his conduct actually caused the plaintiff's injuries. Under this rule Therese Collins, who has sued multiple defendants and has represented that she cannot prove which defendant actually caused her injuries, may not recover punitive damages.

In her second amended complaint, the plaintiff alleged that the defendants had "intentionally, deceitfully, fraudulently, recklessly, or innocently" misrepresented that DES was safe and efficacious for use in preventing miscarriages during pregnancy. The plaintiff further alleged that Dr. Wendt, Mrs. Collins' physician, had relied upon these misrepresentations when prescribing DES for Mrs. Collins. However, in an affidavit submitted by the defendants in conjunction with their motions for summary judgment, Dr. Wendt stated that he relied only on general medical information and "did not use [DES] because of anything that any drug company had told me, and as a matter of fact, no drug company had called on me in respect to using this drug." Dr. Wendt confirmed this fact in his deposition taken July 22, 1981. The plaintiff did not submit an affidavit or any other evidence controverting this fact. Even assuming that the defendants made misrepresentations concerning DES, since there was no reliance on those misrepresentations, there can be no recovery under this cause of action. *See* W. Prosser, *Handbook of The Law of Torts,* sec. 108 (4th ed. 1971); *Household Finance Corp. v. Christian,* 8 Wis. 2d 53, 55–56, 98 N.W.2d 390 (1959).

We have stated that:

". . . Pursuant to sec. 802.08(2), Stats., summary judgment shall be granted 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' "

*Maynard v. Port Publications, Inc.,* 98 Wis. 2d 555, 558, 297 N.W.2d 500 (1980). Under this standard, the trial court was obliged to grant summary judgment in favor of the defendants on the plaintiff's third cause of action as set forth in her second amended complaint. Accordingly, we affirm the trial court's granting of summary judgment insofar as it relates to this cause of action.

In deciding a motion for summary judgment, the initial question is whether the complaint states a claim upon which relief can be granted. *See Prah v. Maretti,* 108 Wis. 2d 223, 228, 321 N.W.2d 182 (1982). The complaint should be dismissed as legally insufficient only if " 'it is quite clear that under no circumstances can the plaintiff recover.' " *Id.* at 229 (citation omitted). We conclude that the plaintiff has stated a claim for which relief can be granted. Accordingly, we find that the trial court erred in granting summary judgment on the general issue of liability. We reverse the trial court's judgment and remand the case for trial on the causes of action approved in this opinion.

Several defendants have filed affidavits and other materials in support of their separate motions for summary judgment. The motions are based upon these defendants' contentions that for one reason or another they could not have produced or marketed the DES taken by the plaintiff's mother. In granting the defendants' joint motion for summary judgment, the trial court did not address the other individual motions. We determine that the trial court should, upon remand, consider these

motions and decide whether summary judgment is appropriate based upon the holding of this opinion.

The remaining issue is whether the trial court erred in denying the plaintiff's motion to amend her second amended complaint. The trial court concluded that the plaintiff had not alleged any new facts, nor had the plaintiff shown sufficient reasons for permitting an amendment of her second amended complaint. Allowing a party to amend pleadings is within the trial court's discretion, *Gustavson v. O'Brien,* 87 Wis. 2d 193, 205, 274 N.W.2d 627 (1979), and will not be reversed unless there has been a manifest abuse of discretion, *Celmer v. Quarberg,* 56 Wis. 2d 581, 592, 203 N.W. 2d 45 (1973). The trial court carefully stated the grounds for its exercise of discretion and based its decision on factors we consider relevant to the determination. Accordingly, we find no manifest abuse of discretion in the trial court's denial of the plaintiff's motion to amend, and, therefore, we affirm the trial court's order.

*By the Court.*—Judgment reversed in part, affirmed in part, and cause remanded for trial and further proceedings consistent with this opinion; order affirmed.

SHIRLEY S. ABRAHAMSON, J. (concurring). I agree with the majority's decision that the plaintiff's complaint states a cause of action. I am persuaded that a cause of action should be recognized on a risk contribution theory. I write separately for two reasons.

First, I believe the majority unnecessarily confuses the issue of apportionment of damages by saying that the "jury will have to apply Wisconsin's comparative negligence doctrine, sec. 895.045, Stats.," *supra,* p. 198. Because plaintiff need not prove that the defendant's negligence or product caused her damage in order for the

defendant to be liable, sec. 895.045 is not really applicable here except by analogy. The doctrine of comparative negligence encompassed in "sec. 895.045, Stats., has been construed from its beginning to apply only to *causal* negligence. . . ." *Lovesee v. Allied Devel. Corp.*, 45 Wis. 2d 340, 343, 173 N.W.2d 196 (1970) (emphasis added). See also *City of Franklin v. Badger Ford Truck Sales*, 58 Wis. 2d 641, 653–55, 207 N.W.2d 866 (1973) (products liability case). I believe the majority tries to fit apportionment of damages within the comparative negligence statute, even though the causal element is not an issue in this kind of case, because it wishes to use two concepts present in the doctrine of comparative negligence: jury apportionment of damages and jury consideration of the kind and character of the defendants' conduct. *Lovesee, supra*, at 345.

Second, although I may not necessarily disagree with the discussion, I do not join the dictum concerning punitive damages. This issue is unnecessary for disposition of the case and was not briefed by the parties.