Susan ZAFFT, Plaintiff-Appellant,

v.

ELI LILLY & CO., et al., Defendants-Respondents,

and

Janice KEUNE and David Keune, Plaintiffs-Appellants,

v.

ELI LILLY & CO., et al., Defendants-Respondents.

No. 65685.

Supreme Court of Missouri, En Banc.

Sept. 11, 1984.

Stephen H. Ringkamp, Mary E. Coffey, St. Louis, for plaintiffs-appellants.

Steven P. Sanders, St. Louis, Lane D. Bauer, Harvey L. Kaplan, Laura D. Stith, Andrew See, Kansas City, Richard B. Scherrer, St. Louis, for defendants-respondents.

HIGGINS, Judge.

This pharmaceutical product liability action arises from the use of diethylstilbestrol (DES). The trial court determined that under Missouri law the admitted inability of plaintiffs to identify which, if any, of the defendants made the product that allegedly caused their injuries was fatal to their claims and granted summary judgment for defendant drug manufacturers. The judge filed a memorandum opinion analyzing DES litigation theories to date and suggesting a theory of his own. The Court of Appeals, Eastern District, agreed with the summary judgment and, citing the trial judge's memorandum, transferred the case to this Court as one of general interest and importance calling for a policy decision and prompting reexamination of existing law. The issue, one of first impression in this state, is whether plaintiffs may recover for injuries allegedly caused by *in utero* exposure to DES absent proof which identifies the particular manufacturer of the DES taken by their mothers. Affirmed.

DES is a synthetic estrogenic hormone which, along with similar chemical derivatives of stilbene, was first manufactured as a miscarriage preventative in 1947. Comment, *Overcoming the Identification Bur-*

*den in DES Litigation: The Market Share Liability Theory*, 65 Marq.L.Rev. 609 (1982). DES duplicates the activity of estrogen, a female sex hormone linked to problem pregnancies in the 1930's. As opposed to the natural estrogen formerly used in the treatment of problem pregnancies, DES was inexpensive and easy to administer. *Ferrigno v. Eli Lilly & Co.*, 175 N.J.Super. 551, 420 A.2d 1305 (1980). From the time the United States Food and Drug Administration approved the drug to 1971, more than 200 drug companies participated in the market. *Ryan v. Eli Lilly & Co.*, 514 F.Supp. 1004 (D.C.S.C.1981). DES continues in use today for non-pregnancy related disorders. *Lyons v. Premo Pharmaceutical Laboratories, Inc.*, 170 N.J.Super. 183, 406 A.2d 185 (App.Div.1979), *certif. denied*, 82 N.J. 267, 412 A.2d 774 (1979). In 1971, researchers reported a statistical link between fetal exposure to DES during pregnancy and the subsequent development of cancer of the reproductive organs in the female offspring. Late that year, the FDA halted use of the drug to prevent miscarriage. *Collins v. Eli Lilly Co.*, 116 Wis.2d 166, 342 N.W.2d 37 (1984).

The instant action is one of a number of similar lawsuits filed across the country. Annot., 22 A.L.R. 4th 183 (1983); Note, *Market Share Liability: An Answer to the DES Causation Problem*, 94 Harv.L. Rev. 668 (1981). Plaintiffs here filed two separate actions for actual and punitive damages against thirteen manufacturers and distributors of DES for use in the prevention of miscarriage. Plaintiffs allege that these defendants represent all or substantially all of the known manufacturers, sellers, or distributors of stilbene derivatives in Missouri at the relevant time. Plaintiffs further allege that their mothers, while pregnant with plaintiffs, ingested DES manufactured, sold or distributed by one of the named defendants. Plaintiffs claim that the cancerous or pre-cancerous conditions from which they suffer are a direct result of their exposure *in utero* to DES. Plaintiffs charge that defendants represented the drug as safe while they knew or should have known of its potential carcinogenic effects, and engaged in common marketing practices of generic distribution of DES without adequate warning or testing.

Most important to review of this litigation, is plaintiffs' inability to identify which of the defendants manufactured, sold or distributed the particular products ingested by their mothers. DES was marketed generically by as many as 300 drug companies. The problems linked to its use surface many years following exposure, and neither memories nor records provide assistance in matching a specific dosage with an individual manufacturer. *Collins, supra*. In their appeal of the summary judgments for defendants, appellants contend, however, that "justice requires" that Missouri law recognize some form of "enterprise" liability against DES manufacturers despite the inability of a plaintiff to identify the manufacturer of the particular drug which caused the individual injury.

■ Respondents raise various procedural objections to review, asserting that appellants failed to state wherein and why the ruling of the trial court is erroneous. R. 84.04(d). The purpose of the rule is to ensure that opposing counsel and the court receive notice of the issues raised. *Thummel v. King*, 570 S.W.2d 679, 690 (Mo. banc 1978). The identification problem and element of causation emerged early in these proceedings as the critical issues and appellants clearly reiterate their claims on appeal. By contrast, in respondents' citations, the appellate courts declined to consider certain of the appellants' points because they wholly failed to identify the action of the trial court challenged on appeal. *See, e.g., State ex rel. Mayfield v. Joplin*, 485 S.W.2d 473, 476 (Mo.App.1972).

■ The affidavits and accompanying materials filed by respondents in support of their motions, not denied by appellants, stand admitted. *Cherry v. Hayti Heights*, 563 S.W.2d 72 (Mo. banc 1978). An order of summary judgment will not be set aside on review if supportable on any theory. *Kirkwood v. Sunset Hills*, 589 S.W.2d 31

(Mo.App.1979). Summary judgment is appropriate in the first instance only when no theory within the scope of the pleadings, depositions, admissions and affidavits filed would permit recovery and the moving party is entitled to judgment as a matter of law. This Court reviews the record on summary judgment in the light most favorable to appellants. *Scott v. Thornton*, 484 S.W.2d 312 (Mo.1972).

Appellants sought recovery on theories of breach of implied warranty; negligence per se in failing to comply with the federal drug laws; common law negligence in failing to test, or inadequately testing the product, and in failing to warn of its potential harm; and strict liability in tort, all of which are recognized in Missouri. In addition, the trial court analyzed four theories recognized in DES cases in other jurisdictions but not yet considered by the courts of this state. All were denied by the entry of summary judgment.

 Actionable negligence requires a causal connection between the conduct of the defendant and the resulting injury to the plaintiff. *Warner v. St. Louis and M.R.R. Co.*, 178 Mo. 125, 77 S.W. 67 (1903); *Rose v. Thompson*, 346 Mo. 395, 141 S.W.2d 824 (1940). Appellants do not challenge this rule of Missouri tort law. The theory of strict tort liability holds "one who sells" a defective product unreasonably dangerous to the user liable for resulting injury. Restatement (Second) of Torts § 402 A (1965), adopted in *Keener v. Dayton Electric Manufacturing Company*, 445 S.W.2d 362 (Mo.1969). Missouri courts no longer limit application of the theory to sellers alone, *Gabbard v. Stephenson's Orchard, Inc.*, 565 S.W.2d 753 (Mo.App.1978), yet to recover under strict liability, as with any other tort theory, plaintiff must establish some causal relationship between the defendant and the injury-producing agent. Because appellants are unable to do so, they have, as the trial and appellate courts observed, "pleaded themselves out of court."

The four theories considered by the trial court, recognized in other jurisdictions and presented by appellants for consideration either relax or dispense with the element of causation.

One, alternative liability, applies when two or more defendants act tortiously toward plaintiff who, through no fault of his own, cannot identify which one of the joined defendants caused the injury. The burden of proof shifts to each defendant to prove his innocence. Restatement (Second) of Torts § 433 B(3) (1965); *Summers v. Tice*, 33 Cal.2d 80, 199 P.2d 1 (1948). This theory, best illustrated by *Summers, supra*, has not achieved full acceptance in Missouri. *Schoening v. Claus*, 363 Mo. 119, 249 S.W.2d 361 (1952). In *Summers*, two hunters negligently fired in the direction of the plaintiff who was unable to determine which of the two shots hit and injured him. The jurisdiction first allowing recovery under alternative liability declined to apply it to a DES case. *Sindell v. Abbott Laboratories*, 26 Cal.3d 588, 607 P.2d 924, 163 Cal.Rptr. 132 (1980), *cert. denied*, 449 U.S. 912, 101 S.Ct. 285, 66 L.Ed.2d 140 (1980). Notwithstanding appellants' allegations, the uncontroverted materials filed by defendants indicate that 151 companies, some based in St. Louis, manufactured DES during the time in question. Thus, unlike the typical situation warranting application of alternative liability, all possible tortfeasors are not before the court and the actual wrongdoers may escape liability. "In such a context, the possibility that any of the [named] defendants supplied the DES to plaintiff's mother is so remote that it would be unfair to require each defendant to exonerate itself." *Sindell, supra*, 26 Cal.3d at 603, 607 P.2d at 931, 163 Cal.Rptr. at 139. And although alternative liability as formulated in *Summers, supra*, does not require that defendants be in a better position to identify the source of the harm, *Sindell, supra*, this is important to application of the theory. Here, the passage of time impairs the efforts of respondents and appellants alike to determine which of the defendants were responsible. Indeed, the trial court found that appellants have easier access to possi-

ble sources of information than do respondents.

The concert of action theory imposes liability upon "all those who, in pursuance of a common plan or design to commit a tortious act, actively take part in it, or further it by cooperation or request, or who lend aid or encouragement to the wrongdoer, or ratify and adopt his acts done for their benefit...." Prosser, Law of Torts § 46, at 292 (4th ed. 1971). Restatement (Second) of Torts § 876 (1977). A frequent illustration of the theory is the automobile drag race. The element of agreement or cooperation necessary to application of this theory is lacking in this case. The history of the development and marketing of DES reveals independent, albeit similar, conduct on the part of the drug companies. *Ryan, supra*, at 1008–1011. The only activity that resembles "concerted action" occurred in 1941 when the FDA required companies interested in manufacturing DES for non-pregnancy related purposes to pool their clinical data in a master file for the agency's consideration. One of the two courts adopting the concert of action theory in a DES case acknowledged that these activities are distinct from the 1947 application process which preceded FDA approval of the drug to treat accidents of pregnancy. *Bichler v. Eli Lilly & Co.*, 55 N.Y.2d 571, 585, 436 N.E.2d 182, 188 n. 7, 450 N.Y.S.2d 776, 782 n. 7 (1982). The *Bichler* court emphasizes that the instructions of the trial court on concerted action constituted the governing law of the case due to the failure of the defendant drug company to preserve its objections to these instructions for review. Further, the concert of action theory developed, not to relieve plaintiffs of the burden of identifying the wrongdoer, but to impose liability on culpable co-participants and thereby deter antisocial group conduct. *Abel v. Eli Lilly & Co.*, 418 Mich. 311, 343 N.W.2d 164, 176 n. 19 (1984); *Collins, supra*, 342 N.W.2d at 46–47.

A third theory proposed as a basis for recovery against defendants here is industry-wide liability. Appellants cite *Hall v. E.I. Du Pont de Nemours & Co., Inc.*, 345 F.Supp. 353 (E.D.N.Y.1972). *Hall* is distinguishable on its facts and the court there expressly limited its holding to the circumstances presented. The cases arose from eighteen unrelated accidents in which children were injured by exploding blasting caps. The district court held that plaintiffs stated a cause of action although in one of the two consolidated cases, the responsible manufacturers were unknown. The named defendants in *Hall* represented the entire blasting cap industry in the United States, along with its trade association. Plaintiffs alleged that defendants jointly delegated product safety functions to their association. The allegations of explicit cooperation, if proven, could support a finding that the defendants jointly controlled the risk of harm. The court cautioned against the application of industry-wide liability to a decentralized industry composed of numerous producers. This Court agrees with the majority of courts which reject industry-wide liability in DES cases because of the large number of drug manufacturers involved, the lack of evidence of delegation of responsibility for safety standards to a trade association, and the pervasive role of the FDA in setting industry-wide standards. *See, e.g., Morton v. Abbott Laboratories*, 538 F.Supp. 593 (M.D.Fla.1982).

The case most often cited in reported opinions on the liability of unidentifiable manufacturers is *Sindell, supra*. The *Sindell* majority, after considering and rejecting each of the three theories discussed above, adopted an extended version of alternative liability, since denominated "market share liability." This theory requires that plaintiffs join as defendants a number of DES manufacturers sufficient to constitute a substantial share of the market. The burden then shifts to each defendant to exonerate itself or to join, by third party petition, other drug producers not named by plaintiff. Damages would then be apportioned among the remaining defendants on the basis of the share of the market each held. Comment, *DES and a Proposed Theory of Enterprise Liability*, 46 Fordham L.Rev. 963 (1978). The prediction of the dissenters in *Sindell* that few courts

would follow the majority's lead has proved correct. Thus far, *Sindell* stands alone in adopting market share liability. The court in *Sindell* failed to resolve numerous problems with application of the theory. These problems persist and discourage courts in other jurisdictions from embracing the theory as a solution to the DES cases.

Respondents argue that market share liability is unfair, unworkable, and contrary to Missouri law, as well as unsound public policy. This Court agrees. The California court did not define the relevant market, nor did it specify what constitutes a "substantial" share of the market. *Sindell, supra,* 26 Cal.3d at 612, 607 P.2d at 937, 163 Cal.Rptr. at 145. Difficulties in determining market share for the purposes of apportioning damages remain. Rather than alleviate the concerns present with alternative liability, market share liability continues the risk that the actual wrongdoer is not among the named defendants, and exposes those joined to liability greater than their responsibility. *Payton v. Abbott Labs,* 386 Mass. 540, 437 N.E.2d 171 (1982). Fischer, *Products Liability—An Analysis of Market Share Liability,* 34 Vand.L.Rev. 1623 (1981).

■ The trial judge's own theory provokes respondents to argue that the theory is not properly the subject of review because not raised by appellants below. The trial court raised the theory *sua sponte.* It incorporates principles raised in the petitions. *Compare Huter v. Birk,* 439 S.W.2d 741, 745 (Mo.1969) ("We cannot affirm on a theory not covered by the pleadings and not actually presented to the trial court.") *with Katz v. Slade,* 460 S.W.2d 608, 614 (Mo.1970) (remanding case to permit plaintiffs to proceed on different theory). Thus this Court considers the proposed theory but declines to adopt it for the same reasons the Court rejects the theories previously discussed and because of additional policy considerations that follow.

Under the theory suggested by the trial judge, plaintiffs must prove, in addition to the traditional elements of a products liability action, that defendants knew that the product would be sold and used in a manner such that identification with a particular manufacturer would be impossible. If plaintiffs further allege that they are unable, through no fault of their own, to identify the manufacturer, their claims will withstand dismissal. The record before this Court does not support the assumption apparently underlying this theory, that defendant drug manufacturers unwisely accelerated the marketing of their products in generic form so as to render identification impossible.

This Court acknowledges and respects the compelling reasons motivating the trial court and courts of other states to resolve the dilemma presented in these cases by straining existing law or adopting novel theories. Plaintiffs are innocent and claim serious injuries alleged to result from their mothers' use of DES. Yet simply to state, as have courts ruling in favor of plaintiffs, that as between an innocent plaintiff and negligent defendants, the latter should bear the cost of the injury, *Collins, supra,* 342 N.W.2d at 49, and that defendants can better absorb this cost, *Sindell, supra,* 26 Cal.3d at 611, 607 P.2d at 936, 163 Cal. Rptr. at 144, ignores strong countervailing considerations.

■ Missouri law does not guarantee relief to every deserving plaintiff. *O'Neill v. Claypool,* 341 S.W.2d 129 (Mo.1960).

If the injury may have resulted from one of two causes, for one of which, and not the other, the defendant is liable, the plaintiff must show with reasonable certainty that the cause for which the defendant is liable produced the result; and, if the evidence leaves it to conjecture, the plaintiff must fail in his action.

*Warner, supra,* 77 S.W. at 70. The development of products liability and comparative negligence in this state leave this established requirement of proving causation intact; neither logic nor fairness requires this Court to dispense with this requirement in the present cases because it previously adopted strict products liability and comparative negligence. *Morton, supra,* at 599. To shift the burden of proof on

causation to respondents substantially alters the existing rights and liabilities of the litigants. *See Daniels v. Smith,* 471 S.W.2d 508, 512–513 (Mo.App.1971). There is insufficient justification at this time to support abandonment of so fundamental a concept of tort law as the requirement that a plaintiff prove, at a minimum, some nexus between wrongdoing and injury.

Because the theory appellants urge has no support in precedent, the case presents a public policy choice, one with which legislatures, as well as courts, have struggled. *Sindell, supra* (opinion of Richardson, J., dissenting). Competing with the interests of appellants are legitimate concerns that liability will discourage desired pharmaceutical research and development while adding little incentive to production of safe products, for all companies face potential liability regardless of their efforts. *McCreery v. Eli Lilly & Co.,* 87 Cal.App.3d 77, 150 Cal.Rptr. 730 (3d Dist.1978); Comment, *Market Share Liability for Defective Products: An Ill-Advised Remedy for the Problem of Identification,* 76 Nw.U.L. Rev. 300 (1981). And the consequences of imposing liability without identification extend to other areas of products liability law. *Sheffield v. Eli Lilly & Co.,* 144 Cal.App.3d 583, 192 Cal.Rptr. 870 (1st Dist. 1983) (Salk anti-polio vaccine); *Thompson v. Johns-Manville Sales Corp.,* 714 F.2d 581 (5th Cir.1983) *cert. denied,* —— U.S. ——, 104 S.Ct. 1598, 80 L.Ed.2d 129 (1984) (asbestos).

■ This Court concludes that the theories advanced by plaintiffs do not persuade the Court to abandon the Missouri tort law which requires that they establish a causal relationship between the defendants and the injury-producing agent as a precondition to maintenance of their causes of action. Strict liability in tort continues to provide a remedy to those plaintiffs who satisfy the identification requirement. *Ferrigno, supra* (manufacturers identified in three cases); *Lyons, supra* (manufacturer identified).

Accordingly, the summary judgment for defendants is affirmed.

RENDLEN, C.J., and WELLIVER, BILLINGS, BLACKMAR and DONNELLY, JJ., concur.

GUNN, J., dissents in separate opinion filed.

GUNN, Judge, dissenting.

I dissent for the reason that I would apply the rule developed in *Sindell v. Abbott Laboratories,* 26 Cal.3d 588, 607 P.2d 924, 163 Cal.Rptr. 132 (1980), *cert. denied,* 449 U.S. 912, 101 S.Ct. 285, 66 L.Ed.2d 140 (1980). This is not to say that the majority opinion does not recite a completely realistic and appropriate approach to the issue confronting the Court. I only believe that the manufacturers are better equipped to handle the problem.

The propriety of shifting the burden of proof to defendants on the issue of causation-in-fact is amply demonstrated in *Summers v. Tice,* 33 Cal.2d 80, 199 P.2d 1 (1948), referred to in the majority opinion. The conduct of the two hunters who tortiously exposed plaintiff to injury also made it impossible for plaintiff to identify the particular hunter whose conduct had injured him. Nor was it likely that either hunter could have proven that he did not cause the plaintiff's injury. *Sindell,* 607 P.2d at 929, 163 Cal.Rptr. at 137. Nevertheless, the burden to disprove causation was placed upon defendant hunters who, if the burden was not met, remained jointly and severally liable for the whole of plaintiff's damages.

In the present case, as in *Sindell,* plaintiffs allege that manufacturers of DES tortiously exposed the offspring of consumers to serious medical harm. Yet, the nature of the risk combined with the fungible form in which the drug was produced make it impossible to identify the particular manufacturer whose product caused a given injury. It is possible to prove, however, what quantities of the drug were produced and distributed by specific manufacturers in a specific time frame.

The *Sindell* court concluded that the basic approach taken in *Summers v. Tice* was

applicable to the DES milieu, although not without some alteration. Plaintiffs were permitted to shift the burden of proof only upon a showing tht the particular defendants joined in the action together accounted for a substantial portion of all the products which could have actually caused the injury. Defendants who could not prove that their product did not cause the damage would nevertheless be responsible only for that portion of plaintiff's damages corresponding to the relative likelihood that plaintiff's mother purchased their product as opposed to a product manufactured by any one of the other defendants. By adapting the *Summers v. Tice* approach to suit the particular context, the *Sindell* court produced a cogent and fair setting in which DES litigation could proceed.

The majority opinion notes the danger that if less than all of the manufacturers whose products may have been purchased by a plaintiff's mother are named as defendants, the responsible manufacturer may not be held liable and those who are named may pay more than their fair share. Nevertheless, the ability of manufacturers to interplead other manufacturers whose product accounted for a significant portion of the market reduces this risk, although certainly does not eliminate it. The "substantial share of the appropriate market" threshold in *Sindell* does no more than shift to defendants the hazard that certain manufacturers may be defunct or otherwise not amenable to suit.

Furthermore, it is not clear whether the *Sindell* court intended to apportion plaintiff's damages based on a defendant's share of the market relative to the other named defendants or a defendant's share of the market relative to all other manufacturers of DES. *See* Robinson, G., *Multiple Causation in Tort Law: Reflections on the DES Cases,* 68 Va.L.Rev. 713, 726 (1982). This latter approach would be more consistent with probability and more consistent with a theory of "apportionment of causation" as opposed to apportionment of fault. *Id.* Such a scaling of liability in accordance with probability would vitiate the danger of proceeding against less than all of the manufacturers who may have manufactured the product which caused the harm and would render the "substantial share" threshold unnecessary.

The majority expresses concern that the *Sindell* court did not define the "relevant market" concept. It would seem that there are actually two different concepts of "relevant market" applicable to this situation. The first is a component of the threshold requirement that the named defendants together account for a substantial share of the relevant market; *i.e.,* a substantial likelihood that their products were actually purchased and consumed by the DES mother. Since this threshold need not be a stringent one to meet, this likelihood could be demonstrated by fairly general proof regarding defendants' shares of the total amount of DES marketed. No great degree of specificity should be required of plaintiffs prior to discovery.

The second "relevant market" concept comes into being once plaintiff has survived a motion to dismiss. At that point the precise issue becomes the relative likelihood that the plaintiff's mother actually purchased the product manufactured by the individual defendant. The relevant market is the area of her residence, her drugstore, her pharmacist. While proof of this issue may be fraught with difficulty, it is a difficulty which is more appropriately born by the manufacturers than by the plaintiffs—a legitimate concept in products liability. *Katz v. Slade,* 460 S.W.2d 608, 611–13 (Mo.1970); *Keener v. Dayton Electric Manufacturing Co.,* 445 S.W.2d 362, 364 (Mo.1969). In either sense of the term, the "relevant market" is defined by the DES mother herself, the only real distinction being the means of proof used to describe that market.

The *Sindell* approach, applied in the context of modern apportionment of fault and third-party practice, affords a high degree of correlation between the individual manufacturer's share of the risk and its liability for damages. Quite apart from the evident policy concerns, this correlation (expressed

in terms of probability) provides the justification for the presumption embodied in the shifting burden of proof. *See Detrich v. Mercantile Trust Co.*, 292 S.W.2d 300, 304 (Mo.1956) (presumption may be based on probability, policy or convenience); *see also* Kaye, D., *The Limits of the Preponderance of the Evidence Standard: Justifiably Naked Statistical Evidence and Multiple Causation*, 1982 Am.Bar.Res. Found.J. 487, 509.

For the reasons expressed, I would reverse the trial court's judgment and remand for trial.