Linda MULCAHY and Michael Mulcahy, Personally and Individually, and as Parents and Natural Guardians of Matthew Mulcahy and Marc Mulcahy, Minors, Plaintiffs,

v.

ELI LILLY & COMPANY, a New Jersey Corporation, Movant; Abbott Laboratories, an Illinois Corporation; American Home Products Corporation, a Delaware Corporation, Movant; the Boyle Company, a California Corporation; Breon Laboratories, Inc., a New York Corporation; Burroughs-Wellcome Company, a North Carolina Corporation; Carnrick Laboratories, Inc., a New Jersey Corporation; Cooper Laboratories, Inc., a Delaware Corporation, Movant; Forest-McKesson, Inc., a Maryland Corporation; Merck, Sharp & Dohme, a Delaware Corporation, Movant; Miles Laboratories, Inc., an Indiana Corporation; Ortho Pharmaceutical Corporation, a New Jersey Corporation, Movant; Rexall Drug Company, a Delaware Corporation, Movant; Merrell-Dow Pharmaceutical, Inc., a Delaware Corporation, Movant; Sandoz, Inc., a Delaware Corporation; Schering Corporation, a New Jersey Corporation, Movant; E.R. Squibb & Sons, Inc., a Delaware Corporation, Movant; the Upjohn Company, a Delaware Corporation; Winthrop Laboratories, Inc., a Delaware Corporation; Emons Industries, Inc., a New York Corporation; Glaxo, Inc., a Maryland Corporation; Johnson & Johnson Products, Inc., a New Jersey Corporation, Movant; and Premo Pharmaceutical Laboratories, Inc., Now Known as Lemmon Company of New Jersey, Inc., a New Jersey Corporation, Movant, Defendants-Movants.

No. 85–685.

Supreme Court of Iowa.

April 16, 1986.

David M. Elderkin and Edward M. Blando, of Elderkin, Pirnie, Von Lackum & Elderkin, Cedar Rapids, for defendant-movant Merck.

L.W. Rosebrook and David Swinton, of Ahlers, Cooney, Dorweiler, Haynie, Smith & Allbee, Des Moines, and John C. Mott of Zarlengo, Mott & Zarlengo, Denver, Colo., for defendant-movant Miles Laboratories.

Charles T. Traw, of Leff, Leff, Leff, Haupert & Traw, Iowa City, for defendants-movants Johnson & Johnson and Ortho Pharmaceutical.

William M. Tucker, Bruce L. Walker, and Mary E. Phelan, of Phelan, Tucker, Boyle & Mullen, Iowa City, and A. Edward Grashof, New York City, for defendant-movant Rexall.

Raymond R. Stefani and Frank S. Mitvalsky, of Silliman, Gray & Stapleton, Cedar Rapids, for defendant-movant Merrell-Dow Pharmaceuticals.

Timothy S. White, Michael L. Koon, and J. Richard Johnson, of White & Warbasse, Cedar Rapids, for defendant-movant Sandoz.

D.G. Ribble, of Lynch, Dallas, Smith & Harman, Cedar Rapids, for defendant-movant Schering.

Ross H. Sidney, of Grefe & Sidney, Des Moines, and Lane D. Bauer, Larry R. O'Neal, Stephen E. Scheve, and Andrew See of Shook, Hardy & Bacon, Kansas City, for defendant-movant Eli Lilly.

L.R. Voigts and Richard J. Sapp, of Nyemaster, Goode, McLaughlin, Emery & O'Brien, Des Moines, for defendant-movant Abbott Laboratories.

Don N. Kersten and Stephen G. Kersten, of Kersten, Opheim, Carlson & Trevino, Fort Dodge, for defendant-movant American Home Products.

Wayne C. Collins, David D. Vestal, and Mark C. Zaiger, of Shuttleworth & Ingersoll, Cedar Rapids, for defendants-movants Breon Laboratories and Winthrop Laboratories.

Lawrence E. Blades and William H. Carmichael, of Blades & Carmichael, Cedar Rapids, for defendant-movant Burroughs-Wellcome.

James W. Crawford and Daniel J. McDermott, of Crawford, Sullivan, Read & Roemerman, Cedar Rapids, for defendant-movant Carnrick Laboratories.

Terry J. Abernathy, of Pickens, Barnes & Abernathy, Cedar Rapids, for defendant-movant Cooper Laboratories.

Hearst R. Duncan, Jr., and R. Todd Gaffney, of Duncan, Jones, Riley & Finley, Des Moines, for defendant-movant Upjohn.

Bennett A. Webster and Brent B. Green, of Gamble, Riepe, Webster, Davis & Green, Des Moines, and John H. Schafer, Michael S. Bernstein, and Michael Roth, of Covington & Burling, Washington, D.C., for defendant-movant Glaxo.

William C. Davidson and Constance A. Schriver, of Lane & Waterman, Davenport, for defendant-movant Premo Pharmaceutical.

Jeffrey A. Boehlert and Michael D. Huppert, of Patterson, Lorentzen, Duffield, Timmons, Irish, Becker & Ordway, Des Moines, and Robert L. Kaufman, of Haight, Dickson, Brown & Bonesteel, Santa Monica, Cal., for defendant-movant Squibb.

Randall Nazette, of Nazette, Hendrickson, Marner & Good, Cedar Rapids, and Gerald P. McDermott and Daniel M. Reilly, of McDermott, Hansen, Anderson & Reilly, Denver, Colo., for plaintiffs.

SCHULTZ, Justice.

The central issue here is whether we will depart from our rule of causation that a plaintiff in a products liability action bears the burden of proving the defendant manufactured or supplied the product that caused the injury. Plaintiffs maintain they are injured due to the ingestion in 1949 of a drug, a synthetic estrogen compound of stilbene derivatives which we shall refer to as DES. Plaintiffs are not able to specifically identify the manufacturer of the drug ingested. Consequently, they commenced this action against a group of drug companies who allegedly manufactured DES in 1949. Plaintiffs claim they are the innocent victims of tortious conduct and that their inability to identify the specific manufacturer of the drug after such a long period of time is due to no fault of their own. They urge that we fashion, as a matter of policy based on justice and fundamental fairness, a fair and equitable remedy by shifting the burden of proof as to who manufactured or supplied the product to the DES manufacturers.

The plaintiffs Linda Mulcahy and Michael Mulcahy seek damages personally and as natural guardians for their two children. In 1949 Cleo Rorman was prescribed and ingested DES during her pregnancy with Linda Mulcahy. Plaintiffs allege Linda sustained injury by *in utero* exposure to DES. Further, they claim such exposure caused Linda to give birth prematurely to her two children in 1973 and 1976 and that they sustained injury as a result.

Plaintiffs commenced their action in the United States District Court for the Northern District of Iowa. They filed suit against 25 companies alleged to have manufactured and marketed DES at the time of the ingestion. Plaintiffs have set forth theories of recovery against the defendants based upon strict liability, negligence, misrepresentation, breach of warranties, alternate liability, enterprise liability, market share liability, and concert of action. The record reflects that only three defendants sold DES in Ames, Iowa, in 1949; however, plaintiffs request we assess industry-wide liability against all defendants.

All defendants filed motions for summary judgment in federal district court arguing that there was no evidence as to which defendant marketed or manufactured the DES which Mrs. Rorman ingested. The federal district court reserved ruling on the motions of the three companies that had sales in Ames, Iowa, but held that summary judgment in favor of the remaining defendants would be appropriate "unless Iowa law permits imposition of liability on a defendant without evidence that the defendant manufactured or marketed the particular product that is alleged to have caused the injury." Pursuant to Iowa Code chapter 684A and Iowa Rules of Appellate Procedure 451–61, the federal district court certified questions of law to us and provided a statement of facts.

The federal court posed the facts as follows:

a. In this action, filed August 30, 1983, plaintiffs seek actual and punitive damages against twenty-five (25) drug companies who allegedly manufactured or marketed synthetic estrogen compounds of stilbene derivatives known as Dienstrol, Diethylstilbestrol Diproprionate, and Diethylstilbestrol (hereinafter referred to as DES).

b. Plaintiffs seek to recover for injuries allegedly caused by the ingestion of DES in 1949 by the plaintiff Linda Mulcahy's mother, Mrs. Cleo Rorman, while pregnant with Linda Mulcahy.

c. Mrs. Rorman was prescribed by her physician Dr. Lee E. Rosebrook in Ames, Iowa, where Mrs. Rorman resided in 1949. Dr. Rosebrook's records indicate that he prescribed DES for Mrs. Rorman in 1949, initially in a 2 mg. dosage to be taken once daily, and later

changed to a 5 mg. dosage. Dr. Rosebrook did not specify any particular brand or trade name of DES when he wrote prescriptions for his patients.

d. After conducting extensive discovery, plaintiffs were unable to positively identify which defendant(s) manufactured or marketed the particular DES that was ingested by Mrs. Rorman in 1949. Mrs. Rorman cannot remember where she filled any prescription for DES that she received from Dr. Rosebrook in 1949. She does not remember what the medication she took during pregnancy looked like, its form or any other identifying characteristic. Mrs. Rorman's husband, Wayne Rorman, is unable to identify the pharmacy where any prescription for DES for his wife was filled in 1949, but believes it was one of the downtown pharmacies.

e. Plaintiffs have evidence that DES manufactured by Eli Lilly & Co. was available in at least one pharmacy in Ames, Iowa, in 1949. Plaintiffs assert that they have evidence that DES manufactured by Abbott Laboratories, Inc. and the Upjohn Company may have been available in one Ames, Iowa, pharmacy in 1949.

The federal court posed the following questions:

a. In a DES product liability case when a product has been ingested by a user and when, after exhaustive discovery, and through no fault of any party, the manufactuer or seller of the ingested product cannot be positively identified, will Iowa law recognize any of the following theories of liability:

(1) Market share liability;

(2) Alternative liability; and

(3) Enterprise liability?

b. If Iowa law will recognize any of these theories of recovery when the product ingested and its manufacturer or seller cannot be positively identified,

(1) What must the plaintiff prove before the burden of proof and/or production shifts to the defendant manufacturers or sellers; and

(2) What must a manufacturer or seller demonstrate to exculpate itself from liability?

We note preliminarily that a plaintiff in a products liability action must ordinarily prove that a manufacturer or supplier produced, provided or was in some way responsible for the particular product that caused the injury. *See Osborn v. Massey-Ferguson, Inc.*, 290 N.W.2d 893, 901 (Iowa 1980); *see also* Restatement (Second) of Torts §§ 402A, 433B (1965); W. Prosser, *The Law of Torts* § 98 (4th ed. 1971). In the present action plaintiffs rely on theories which would be exceptions to the rule that a plaintiff must show a causal connection between the defendant's product and plaintiff's injury. Such theories advanced by plaintiffs would allow recovery without proof of which drug company actually manufactured or supplied the DES ingested by Mrs. Rorman.

We proceed to the federal court's question "a" and to the three theories specified there, considering them in reverse order. In addressing the questions posed, we restrict our answers to the facts provided with the certified questions or referred to in our answers. We neither suggest nor foreclose adoption of any of these theories under other circumstances.

I. *Enterprise liability.* Enterprise liability, also termed "industry-wide liability," *see, e.g., Starling v. Seaboard Coast Line Railroad*, 533 F.Supp. 183, 187 (S.D.Ga. 1982); *Zafft v. Eli Lilly & Co.*, 676 S.W.2d 241, 245 (Mo.1984), was first advanced in *Hall v. E.I. Du Pont De Nemours & Co.*, 345 F.Supp. 353 (E.D.N.Y.1972). *Hall* was summarized as follows in *Morton v. Abbott Laboratories*, 538 F.Supp. 593, 598 (M.D. Fla.1982):

Like concert of action, plaintiff's second theory—enterprise liability—would impose liability on each DES manufacturer on the basis of their group conduct. The concept of enterprise, or industry-wide, liability derives from Judge Weinstein's opinion in *Hall v. Du Pont De Nemours & Co.*, 345 F.Supp. 353 (E.D.N.Y.1972). In that case, 13 children sued

six blasting cap manufacturers alleging that they had been injured in explosions of the caps. Although the six defendants were not the only possible sources of blasting caps, they did comprise virtually the entire blasting cap industry in this country. Plaintiffs based their claim on the practices of that industry in failing to take reasonable safety precautions and make reasonable warnings. They alleged that members of the industry had adhered to industry-wide safety standards and had delegated substantial safety investigation and design functions to their trade association.

The *Hall* court focused on the joint conduct of the defendants, finding that their joint control of the risk presented by their industry warranted the imposition of joint liability. *Id.* at 371–76. The facts in this DES case in no way suggest application of *Hall's* theory of joint liability. In *Hall* there were six manufacturers in the industry; here there were 149. Judge Weinstein limited his holding in *Hall* by warning against its application to a "decentralized" industry with many individual members. There was no industry-wide delegation of safety functions to a drug manufacturers' trade association; indeed, if there was any body responsible for safety in the drug industry it was the Food and Drug Administration.

A Pennsylvania court recently summarized the criteria necessary to establish enterprise liability in *Burnside v. Abbott Laboratories*, —— Pa.Super. ——, ——, 505 A.2d 973, 984 (1985):

(1) The injury-causing product was manufactured by one of a small number of defendants in an industry; (2) the defendants had joint knowledge of the risks inherent in the product and possessed a joint capacity to reduce those risks; and (3) each of them failed to take steps to reduce the risk but, rather, delegated this responsibility to a trade association.

■ Were we to accept an enterprise theory of liability, the theory would not apply here. The first criteria in *Burnside*, that the product was manufactured by a small number of defendants in the industry, is not satisfied. Plaintiffs' petition names 25 companies as defendants because they allegedly manufactured and sold DES in 1949. We believe this is not a small number. The number of manufacturers and sellers named, however, may be conservative as revealed by the case law which refers to the DES industry between 1947 and 1971. *See Martin v. Abbott Laboratories*, 102 Wash.2d 581, 589, 689 P.2d 368, 374 (1984) ("The number of firms marketing DES has fluctuated considerably over the years. Estimates are that up to 200 or 300 companies manufactured and marketed DES between 1947 and 1971."); *see also Sindell v. Abbott Laboratories*, 26 Cal.3d 588, 609, 607 P.2d 924, 935, 163 Cal.Rptr. 132, 143 (1980) ("at least 200 manufacturers produced DES"); *Zafft*, 676 S.W.2d at 245 ("reject industry-wide liability in DES cases because of the large number of drug manufacturers involved"); *Collins v. Eli Lilly Company*, 116 Wis.2d 166, 186, 342 N.W.2d 37, 47 (1984) ("involves perhaps hundreds of potential defendant drug companies"). Based on the large number of manufacturers, the assumption underlying the enterprise concept—that defendants jointly control the risk—becomes "necessarily weak." *Collins*, 116 Wis.2d at 186, 342 N.W.2d at 47. The overall number of DES manufacturers mitigates against group conduct requiring imposition of liability on all for the acts of the unidentified wrongdoer.

Under the statement of facts provided us in this case, we are unable to decide whether the other criteria enumerated in *Burnside* have been satisfied. We note, however, that other courts have rejected enterprise liability in DES cases because these other criteria were not met. Unlike the blasting cap industry, DES manufacturers did not control their conduct by jointly imposed safety standards. *Burnside*, —— Pa. Super at ——, 505 A.2d at 985. Members of the DES industry did not delegate control or responsibility for safety functions to a trade association. *Id.* at ——, 505 A.2d at

985; *Morton*, 538 F.Supp. at 598; *Zafft*, 676 S.W.2d at 245. Instead, the Food and Drug Administration exercised pervasive regulation and control. *Sindell*, 26 Cal.3d at 609, 607 P.2d at 935, 163 Cal.Rptr. at 143; *Morton*, 538 F.Supp. at 598; *Zafft*, 676 S.W.2d at 245.

The enterprise liability theory avoids the legal causation problem that arises from an inability to identify the manufacturer of the specific injury-causing product. It does so by shifting responsibility to the industry for causing the injury because of the concert of action by manufacturers of such products through their trade associations or their collective action.

We agree with the court in *Martin* that "enterprise liability as described in *Hall* is predicated upon industry-wide cooperation of a much greater degree than occurred among DES manufacturers." 102 Wash.2d at 599, 689 P.2d at 380. We also agree with the following statement in *Morton*, 538 F.Supp. at 598:

> Accordingly, like the many other courts that have considered the question, this Court finds that the enterprise liability theory espoused in *Hall* cannot support liability in this DES case. *See, e.g., Ryan, supra* at 1017; *Namm v. Charles E. Frosst & Co.*, 178 N.J.Super. 19, 427 A.2d 1121, 1129 (N.J.App.Div.1981); *Sindell, supra*, 26 Cal.3d 588, 163 Cal.Rptr. at 141–42, 607 P.2d at 633–35.

We hold that the facts certified by the federal court in this proceeding are inappropriate for application of enterprise liability in any event.

II. *Alternative liability.* In contrast to the enterprise theory, "alternative liability" does address the problem of causation with respect to the making or the providing of the DES which brought about the injury. Although "alternate liability" also involves wrongful conduct by more than one party, the conduct of one of the parties must have caused the injury to plaintiff. Under this theory the burden of proof as to which actor caused the harm shifts to the defendants because there is uncertainty as to which of them caused the injury. *Morton*,

538 F.Supp. at 598 (citing Restatement (Second) of Torts § 433B(3) (1965)).

The general rule in Iowa, as elsewhere, is that a plaintiff has the burden of proving by a preponderance of the evidence that the defendant caused the complained of harm or injury. Iowa R.App.P. 14(f)(8); Restatement (Second) of Torts § 433B(1) (1965). Causation is an essential element in a tort action. *Iowa Electric Light & Power Co. v. General Electric Co.*, 352 N.W.2d 231, 234 (Iowa 1984). In a negligence action the causation requirement entails proof of a "causal connection between the defendant's alleged negligence and the injury." *Sponsler v. Clarke Electric Cooperative, Inc.*, 329 N.W.2d 663, 665 (Iowa 1983). In strict liability, plaintiff must establish inter alia "(1) manufacture of a product by defendant ... [and] (6) said defect was the proximate cause of personal injuries." *Osborn*, 290 N.W.2d at 901.

The causation requirement necessarily involves two links in a case of this kind: first, that the defendant manufactured the DES ingested by the mother in question, and second, that the DES brought about injuries. *See* Prosser, *The Fall of the Citadel (Strict Liability to the Consumer)*, 50 Minn.L.Rev. 791, 840 (1966). We are only concerned here with the first link, the "identification" requirement. *Payton v. Abbott Labs*, 386 Mass. 540, 571, 437 N.E.2d 171, 188 (1982); *cf. McElhaney v. Eli Lilly & Co.*, 564 F.Supp. 265, 268 (D.S.D.1983) (In distinguishing the two elements: "Causation goes to the question of what instrumentality or mechanism caused the plaintiff's injury ... whereas the issue here is the identity of the source of that instrumentality.").

The identification requirement is summarized thus in an annotation in 51 A.L.R.3d 1344, 1349 (1973):

> Regardless of the theory which liability is predicated upon ... it is obvious that to hold a producer, manufacturer, or seller liable for injury caused by a particular product, there must first be proof that the defendant produced, manufac-

tured, sold or was in some way responsible for the product. . . .

The "alternative liability" theory has been frequently proposed as a means of avoiding the identification problem. *E.g., Morton,* 538 F.Supp. at 595; *Ryan v. Eli Lilly & Co.,* 514 F.Supp. 1004, 1016 (D.S.C. 1981); *Sindell,* 26 Cal.3d at 598, 607 P.2d at 928, 163 Cal.Rptr. at 136; *Abel v. Eli Lilly & Co.,* 418 Mich. 311, 325, 343 N.W.2d 164, 170 (1984); *Zafft,* 676 S.W.2d at 244. The American Law Institute succinctly states the theory in section 433B(3) of the Restatement (Second) of Torts (1965):

> Where the conduct of two or more actors is tortious, and it is proved that harm has been caused to the plaintiff by only one of them, but there is uncertainty as to which one has caused it, the burden is upon each such actor to prove that he has not caused the harm.

> The basis for this exception is said to be the injustice of permitting proved wrongdoers, who among them have inflicted an injury upon the entirely innocent plaintiff, to escape liability merely because the nature of their conduct and the resulting harm has made it difficult or impossible to prove which of them has caused the harm.

Restatement (Second) of Torts § 433B(3) comment f. The theory has its roots in *Summers v. Tice,* 33 Cal.2d 80, 199 P.2d 1 (1948). The facts of *Summers* were summarized as follows in *Namm v. Charles E. Frosst & Co.,* 178 N.J.Super. 19, 32, 427 A.2d 1121, 1127–28 (App.Div.1981):

> [P]laintiff went hunting with the two defendants and specifically cautioned them to stay in line and be careful. However, when a bird was flushed, both defendants fired at it even though plaintiff Summers was directly in the line of fire and clearly visible. Summers was hit once in the eye and once in the lip. It was determined that both defendant hunters were negligent in firing their guns in the direction of plaintiff and that plaintiff could not identify which of the negligent defendants' shots hit him. The court shifted the burden of proof as to whose shot actually hit plaintiff to the two admittedly negligent hunters, the only possible tortfeasors.

*See also* Restatement (Second) of Torts § 433B(3) illustration 9.

*Summers* has generally been distinguished from the DES cases. *See, e.g., Sindell,* 26 Cal.3d at 602–03, 607 P.2d at 931, 163 Cal.Rptr. at 139; *Payton,* 386 Mass. at 572, 437 N.E.2d at 189; *Zafft,* 676 P.2d at 244; *Collins,* 116 Wis.2d at 183, 342 N.W.2d at 46. We agree with the majority of courts holding the "pure" alternative liability theory embodied in section 433B(3) "does not present a viable theory for DES cases." *Collins,* 116 Wis.2d at 183, 342 N.W.2d at 46; *accord, Martin,* 102 Wash. at 595, 689 P.2d at 377. *See also Morton,* 538 F.Supp. at 598–99; *Ryan,* 514 F.Supp. at 1016; *Namm,* 178 N.J.Super. at 34, 427 A.2d at 1128; *Zafft,* 676 S.W.2d at 244. (We note that a contrary result was reached in *Ferrigno v. Eli Lilly & Co.,* 175 N.J.Super. 551, 420 A.2d 1305 (Law Div.1980). *Namm* expressly disagrees with *Ferrigno. Namm,* 178 N.J. Super. at 32, 427 A.2d at 1127 n. 3.)

An element of the alternative liability theory, the conduct of one of the parties caused the injury, is absent in the facts given to us. In the parent case of *Summers,* two defendants were in fact present and both discharged their guns in the plaintiff's direction. An analogous DES case might exist—a question we do not decide— if a plaintiff established that only two manufacturers' DES products were sold at a certain pharmacy, and the mother bought her DES only at that pharmacy but cannot identify which brand she purchased.

 Plaintiffs argue that alternative liability is applicable here because they have limited the field to three defendants—Eli Lilly, Abbott, and Upjohn. They rely on "evidence that DES manufactured by Eli Lilly & Co. was available in at least one pharmacy in Ames, Iowa in 1949" and on their assertion that DES manufactured by Abbott and Upjohn "may have been available in one Ames, Iowa pharmacy in 1949." Assuming arguendo that plaintiffs have

substantial evidence that DES from Lilly, Abbott, and Upjohn was marketed in Ames, Iowa, plaintiffs' *Summers* problem is that they do not possess evidence to negate marketing of DES in Ames by other manufacturers. To say that the three named companies constitute the only possible manufacturers of the DES Mrs. Rorman ingested is sheer speculation; any number of other manufacturers may have supplied DES to the Ames market. As stated in *Namm*, 178 N.J.Super. at 33, 427 A.2d at 1128:

> The application of the principle of alternative liability to any one or all of the [named] defendants herein would impose liability without fault upon any one who manufactured a product manufactured by others as well. It would result in the taking of the property of all the named defendants in order to pay for harm which may have been caused by only one of the defendants, or even by one who is not a party to the lawsuit, who is unknown to the defendants, over whom they have no control or even any meaningful contact.

A decision frequently cited as applying the alternative liability theory in the DES context is *Abel v. Eli Lilly & Co.*, 418 Mich. 311, 343 N.W.2d 164 (1984). On a motion to dismiss, the Michigan Supreme Court held that the plaintiffs stated a cause of action based on the theory of alternative liability. *Id.* at 339, 343 N.W.2d at 177. The court noted several significant differences between *Summers* and the factual situation involving DES. Despite these differences, the court fashioned a "DES-modified alternative liability" theory "to accommodate the unique facts of this unusual litigation." *Id.* at 329, 343 N.W.2d at 172. The *Abel* court's version still requires plaintiffs to prove they have been harmed by the conduct of one of the defendants—requiring plaintiffs to "bring before the court all the actors who may have caused the injury in fact." *Id.* at 331, 343 N.W.2d at 173. Plaintiffs also have the burden of showing that all the defendants have acted tortiously, and that plaintiffs, through no fault of their own, are unable to identify which actor caused the injury. *Id.* For the reasons we have stated regarding the inapplicability of the alternative liability theory to this case, we decline to follow *Abel*.

We hold that alternative liability is inapplicable under the facts presented to us.

III. *Market share liability.* Some courts have structured new theories to overcome one of the problems encountered in applying alternative liability in DES cases—failure to have all possible producers before the court. *See, e.g., Sindell v. Abbott Laboratories*, 26 Cal.3d 588, 607 P.2d 924, 163 Cal.Rptr. 132 (1980); *Martin v. Abbott Laboratories*, 102 Wash.2d 581, 689 P.2d 368 (1984); *Collins v. Eli Lilly Co.*, 116 Wis.2d 166, 342 N.W.2d 37 (1984).

The California Supreme Court in *Sindell* discussed the need for a cause of action for injured plaintiffs:

> In our contemporary complex industrialized society, advances in science and technology create fungible goods which may harm consumers and which cannot be traced to any specific producer. The response of the courts can be either to adhere rigidly to prior doctrine, denying recovery to those injured by such products, or to fashion remedies to meet these changing needs.

26 Cal.3d at 610, 607 P.2d at 936, 163 Cal.Rptr. at 144.

The court cited the "most persuasive" policy reason supporting a remedy was that "as between an innocent plaintiff and negligent defendants, the latter should bear the cost of the injury." *Id.* at 610–11, 607 P.2d at 936, 163 Cal.Rptr. at 144. Further, the court relied on a "broader policy standpoint" that "defendants are better able to bear the cost of injury resulting from the manufacture of a defective product." *Id.* at 611, 607 P.2d at 936, 163 Cal.Rptr. at 144.

The "market share" theory, fashioned in *Sindell*, apportions liability among defendants based on their respective shares of the "relevant" market. The plaintiff must first join "the manufacturers of a substantial share of the DES which her mother

might have taken," and also meet her burden as to all other elements. *Id.* at 612, 607 P.2d at 937, 163 Cal.Rptr. at 145. The burden of proof then shifts to the defendants to demonstrate they could not have manufactured the DES that caused the plaintiff's injuries. *Id.* If a defendant fails to meet this burden, the court fashions a "market share" theory to apportion damages according to the likelihood that any of defendants supplied the product by holding each defendant liable "for the proportion of the judgment represented by its share of that market." *Id.* The intended result under this approach is that "each manufacturer's liability for an injury would be approximately equivalent to the damage caused by the DES it manufactured." *Id.* at 613, 607 P.2d at 938, 163 Cal.Rptr. at 146. The market share theory was approved by a federal district court as expressing South Dakota law, in *McElhaney v. Eli Lilly & Co.*, 564 F.Supp. 265, 271 (D.S.D.1983). *See also Zafft*, 676 S.W.2d at 247 (Gunn, J., dissenting).

The Washington and Wisconsin Supreme Courts also advocate a modification of alternative liability based on substantially the same policy considerations. *Martin*, 102 Wash.2d at 603, 689 P.2d at 381; *Collins*, 116 Wis.2d at 189, 342 N.W.2d at 48. They add that all manufacturers and distributors of DES "contributed to the *risk* of injury to the public and, consequently the risk of injury to individual plaintiffs," and therefore share a degree of culpability. *Collins*, 116 Wis.2d at 191, 342 N.W.2d at 49; *accord Martin*, 102 Wash.2d 604, 689 P.2d 382. The approaches of these two jurisdictions differ from the *Sindell* market share theory only in the apportionment of damages.

The Washington court, finding the *Sindell* theory distorts liability because only a substantial share of likely defendants share all of the damages, developed an approach termed the "market-share alternate liability." *Martin*, 102 Wash.2d at 602, 689 P.2d at 381. Application of this theory permits a plaintiff to commence an action against only one defendant and requires the plaintiff to establish by a preponderance of the evidence that the defendant produced or marketed the type of DES ingested by the plaintiff's mother. *Id.* at 604, 689 P.2d at 382. A defendant may bring in other defendants. Damages are allocated initially by presuming that each defendant has an equal share. Defendants are entitled to rebut this presumption by establishing their respective market share in plaintiff's geographic area, thus reducing their potential liability. *Id.* at 605–06, 689 P.2d at 383. If the defendants are able to establish their market share, they are only liable for that percentage of the total judgment. Other defendants who fail to establish their relevant market share are liable for a readjusted, equal share of the remaining damages. *Id.* at 606, 689 P.2d at 383. *See also McCormack v. Abbott*, 617 F.Supp. 1521 (D.Mass.1985) (adopting *Martin* approach which the federal court held was consistent with Massachusetts court's guidelines in *Payton v. Abbott*, 386 Mass. 540, 437 N.E.2d 171 (1982)).

The Wisconsin court, finding that "unalloyed market share theory does not constitute the most desirable course to follow in DES cases because the theory, while conceptually attractive, is limited in practical applicability," fashioned what is frequently termed the "risk contribution theory." *Collins*, 116 Wis.2d at 189, 342 N.W.2d at 48. Under this theory, as in *Martin*, the plaintiff is only required to sue one defendant and to allege the defendant produced or marketed the type of DES taken by the plaintiff's mother. If only one defendant is sued and no others are impleaded by the defendant, that defendant is liable for all of the damages. *Id.* at 193, 342 N.W.2d at 50. If more than one defendant is joined or impleaded, damages are determined according to the jury's assignment of liability under Wisconsin's comparative negligence statute. *Id.* at 199, 342 N.W.2d at 52–53. The court lists several factors that the jury should consider in apportioning damages among the defendants. *Id.* at 200, 342 N.W.2d at 53.

■ We reject the market share liability theory on a broad policy basis. We ac-

knowledge that plaintiff in a DES case with an unidentified product manufacturer presents an appealing claim for relief. Endeavoring to provide relief, courts have developed theories which in one way or another provided plaintiffs recovery of loss by a kind of court-constructed insurance plan. The result is that manufacturers are required to pay or contribute to payment for injuries which their product may not have caused.

This may or may not be a desirable result. We believe, however, that awarding damages to an admitted innocent party by means of a court-constructed device that places liability on manufacturers who were not proved to have caused the injury involves social engineering more appropriately within the legislative domain. In order to reach such a determination, three broad policy questions must be answered. One is whether the burden of damages for these injuries should be transferred in a constitutional manner to the industry irrespective of an individual manufacturer's connection with the particular injury. If so, the second question relates to the principles and procedures by which the burden would be transferred. Finally, how do we ascertain the extent of damages to be assessed against each manufacturer? As to the latter, we note a wide divergency of solutions advanced by courts in fashioning relief without the benefit of legislation.

Our General Assembly has not entered this field, and we in the judicial branch adhere to our established principles of legal cause. *Starling v. Seaboard Coast Line Railroad,* 533 F.Supp. 183, 190 (S.D.Ga. 1982); *Zafft v. Eli Lilly & Co.,* 676 S.W.2d 241, 247 (Mo.1984). *Cf. Mizell v. Eli Lilly & Co.,* 526 F.Supp. 589 (D.S.C.1981) (relying on *Ryan,* 514 F.Supp. 1004, court rejects *Sindell* market share theory as choice of law because it violates public policy of the forum). A commentator in the field of negligence has stated, "Proof of negligence in the air, so to speak, will not do." F. Pollock, *The Law of Torts* 455 (11th ed. 1920). Plaintiffs request that we make a substantial departure from our fundamental negligence requirement of proving cau-

sation, without previous warning or guidelines. The imposition of liability upon a manufacturer for harm that it may not have caused is the very legal legerdemain, at least by our long held traditional standards, that we believe the courts should avoid unless prior warnings remain unheeded. It is an act more closely identified as a function assigned to the legislature under its power to enact laws.

We hold correspondingly that under Iowa common law a plaintiff in a products liability case must prove that the injury-causing product was a product manufactured or supplied by the defendant. We reserve for later consideration the case which involves actual concert of action by the defendants and the case which is genuinely factually analogous to *Summers v. Tice,* 33 Cal.2d 80, 199 P.2d 1 (1948). This proceeding does not present such facts.

We thus answer certified question "a" in the negative. Certified question "b" requires no answer.

CERTIFIED QUESTION ANSWERED.

All Justices concur except LAVORATO, J., who takes no part.